**In re Charles E. CHISHOLM, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 95–BG–1030.**

District of Columbia Court of Appeals.

Argued April 25, 1996.
Decided July 3, 1996.

Charles E. Chisholm, pro se.

Traci M. Tait, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, was on the brief, for Bar Counsel.

Elizabeth J. Branda, Washington, DC, for the Board on Professional Responsibility.

Before FERREN and SCHWELB, Associate Judges, and BELSON, Senior Judge.

SCHWELB, Associate Judge.

The Board on Professional Responsibility has recommended that Charles E. Chisholm, a member of our Bar, be suspended from practice for six months and that he be required, as a condition of reinstatement, to pay $1,000, with interest, as restitution. Chisholm and Bar Counsel have both excepted to the proposed sanction. Chisholm denies that he violated either the Rules of Professional Conduct or the former Code of Professional Responsibility.[1] He asks that the charges against him be dismissed and that no discipline be imposed. Bar Counsel agrees that the court should suspend Chisholm for six months and order him to pay restitution, but recommends, as did the Hearing Committee, that Chisholm also be required, as a condition of reinstatement, to demonstrate his fitness to practice law. We order the discipline recommended by the Hearing Committee and by Bar Counsel.

## I.

### THE DISCIPLINARY PROCEEDINGS

The disciplinary charges against Chisholm arose out of his failure, over a period of more than six years, to pursue an appeal from a deportation order which was entered in 1986 against his client, Rupert Morris. Morris' sister, Dorothy Morgan, had paid Chisholm $1,000 to represent Morris in connection with his pending deportation. On February 15, 1991, Morris' appeal was dismissed on account of counsel's failure to file a brief on Morris' behalf. On February 9, 1993, Morris was arrested at gunpoint and detained by the Immigration and Naturalization Service (INS). Morris remained in custody until May 5, 1993.

As a result of these events, Bar Counsel charged Chisholm with a number of disciplinary violations involving neglect and dishonesty.[2] An evidentiary hearing was held before Hearing Committee No. 2 (the Committee). On November 15, 1994, the Committee found by clear and convincing evidence that Chisholm had committed all of the charged violations. The Committee recommended that Chisholm be suspended for six months and that he be required, as conditions of reinstatement, to pay restitution and to demonstrate his fitness to practice law.

On August 3, 1995, the Board sustained the Committee's findings of fact and conclusions of law. The Board also agreed with the Committee's proposed sanction as to suspension and restitution. While characterizing the question whether to require proof of fitness prior to reinstatement as a "close" one, however, the Board concluded that such a requirement would be unwarranted.

---

1. Chisholm's alleged misconduct occurred both before and after January 1, 1991, the date on which the Rules superseded the Code.

2. The charges against Chisholm included the following:

DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation);

DR 1–102(A)(5) (engaging in conduct that is prejudicial to the administration of justice);

DR 6–101(A)(3) (neglecting a legal matter entrusted to counsel);

DR 7–101(A)(1) and (2) (intentionally failing to seek the lawful objectives of a client through reasonably available means permitted by law and/or intentionally failing to carry out a contract of employment entered into for professional services);

DR 7–101(A)(3) (intentionally prejudicing and/or damaging a client during the course of the professional relationship);

Rule 1.3(a) (failing to represent a client with diligence and zeal);

Rule 1.3(b)(1) (intentionally failing to seek the lawful objectives of a client);

Rule 1.3(b)(2) (intentionally prejudicing or damaging a client during the course of the professional relationship); and

Rule 1.4(a) and (b) (failing to keep a client reasonably informed about the status of the matter and/or failing to explain the matter to the client to the extent reasonably necessary to permit a client to make informed decisions regarding the representation).

## II.

### BAR COUNSEL'S EVIDENCE

The testimony and documentary evidence before the Hearing Committee revealed that Morris, a Jamaican national who had been living in the United States for many years, was convicted in 1979 and in 1980 of unlawful possession of marijuana. He was placed on probation and ordered to perform community service.

On or about September 18, 1986, Morris was arrested and charged in the United States District Court for the District of Columbia with distribution of marijuana and with possession of marijuana with intent to distribute it (PWID), in violation of 21 U.S.C. § 841(a). The following month, an INS immigration judge entered an order directing Morris to show cause why he should not be deported. Morris retained Michael Maggio, Esq., an immigration attorney, to represent him before the INS. Maggio requested a discretionary waiver of deportation, contending that Morris had been rehabilitated.

On April 28, 1987, following a hearing, the judge found, *inter alia*, that Morris had continued to use marijuana and that he had not rehabilitated himself. The judge ordered that Morris be deported to Jamaica. Maggio filed a timely appeal on Morris' behalf with the Board of Immigration Appeals (BIA).

On June 1, 1987, a jury convicted Morris of both felony charges against him. On July 23, 1987, Morris was sentenced to serve concurrent terms of one year on each count, and a special parole term of two years was also imposed. Morris was remanded to federal custody.

Chisholm, as Morris' counsel, filed post-trial motions on his client's behalf and noticed an appeal. On October 14, 1987, the United States Attorney moved to vacate Morris' convictions and to dismiss the under-

lying indictment.[3] Morris was promptly released from prison.

Morris testified that while Chisholm was representing him in the criminal matter, Chisholm offered to handle the immigration matter as well. According to Morris, Chisholm assured him that Chisholm had prior experience in immigration law and that he would represent him for $1000, an amount significantly smaller than Maggio's anticipated fee. On September 2, 1987, Mrs. Morgan (Morris' sister) met with Chisholm at his office and engaged him to represent Morris in his immigration appeal. According to Mrs. Morgan, Chisholm assured her, as he had assured Morris, that she had nothing to worry about because Chisholm was very experienced in immigration matters. Mrs. Morgan gave Chisholm $1000. Chisholm gave Mrs. Morgan a handwritten receipt stating that he had received "$1000 for services in Immigration Case."

On February 5, 1988, Chisholm wrote to Maggio to advise him that Chisholm had "been retained by Mr. Rupert Morris" regarding his "Deportation file." Chisholm requested that Maggio apprise INS of the change in representation. On February 24, 1988, Maggio filed a motion for leave to withdraw as Morris' counsel. Maggio submitted Chisholm's letter as the basis for his motion. On the same day, Maggio wrote to Chisholm and explained that Chisholm was obliged to notify the immigration judge immediately that he (Chisholm) was Morris' new attorney of record. Maggio advised Chisholm to file a duly executed Notice of Entry of Appearance Form ("Form G-28"), and he indicated that the judge would not act on Maggio's motion to withdraw until Chisholm had filed a Form G-28.

Notwithstanding the information which he had received from Maggio, and in spite of the

---

**3.** Morris' case had been investigated by the Metropolitan Police Department's Fourth District Vice Unit. Following the discovery of fraudulent and unlawful practices within that unit, the United States Attorney moved to set aside the convictions of defendants whose prosecutions had been initiated on the basis of investigations conducted by Fourth District Vice. Although Chisholm claims that he accomplished a great deal for

Morris in the criminal case, it appears that the charges were dismissed as a result of circumstances over which Chisholm had no control.

Chisholm testified that his fee for his representation of Morris in the criminal case was $7,500, and that he was paid only $4,500. Dorothy Morgan testified that Chisholm's agreed-upon fee was paid in full.

fact that he had been paid $1000 to handle Morris' immigration problem, Chisholm never presented Morris or Mrs. Morgan with a Form G–28. Chisholm later testified that he did not send the form to Morris for signature while Morris was incarcerated because he did not trust Morris to sign the document except in Chisholm's presence. He stated that Morris was a criminal who might later disavow his own signature.

Morris testified that he telephoned Chisholm from prison periodically, and that Chisholm advised him that "the immigration people" could not find Morris' file. According to Morris, Chisholm assured him that "no news is good news" and that if Morris did not receive any written correspondence from INS, his case had probably been closed. Morris also testified that he telephoned Chisholm on the morning following his release, and that Chisholm told him that the INS still had not found Morris' file and that Morris should call Chisholm again in a few days. Morris did so, but Chisholm indicated that the situation had not changed, and he reassured Morris that Morris need not worry. Morris also testified that Chisholm told him that he (Chisholm) had filed a brief in Morris' behalf.

Morris told the Hearing Committee that he was subsequently unable to make contact with Chisholm because Chisholm continuously attempted to evade him. Morris recalled that whenever he called Chisholm's office, a secretary would claim that Chisholm was not there and that Morris should call back at a specified time later in the day. When Morris called back as directed, the secretary would then tell Morris that Chisholm would be out of the office for the remainder of the day. Morris claimed that he left messages, but that in most instances Chisholm did not return his calls. Both Morris and Mrs. Morgan testified that when they did reach Chisholm and arranged to meet with him,

Chisholm would subsequently cancel the appointment.[4]

Morris testified that Chisholm's repeated reassurances lulled him into believing that his immigration matter had been resolved and that he had nothing to worry about. On February 15, 1991, however, Morris' immigration appeal was summarily dismissed on account of his attorney's failure to file a brief.[5] Morris and Mrs. Morgan knew nothing about this development until February 9, 1993. On that day, INS officials took Morris into custody at gunpoint and detained him pending deportation.

Mrs. Morgan immediately attempted to contact Chisholm. She testified that she called every telephone number which Chisholm had given her, and that she checked all relevant directories, all to no avail. Finally, finding herself unable to reach Chisholm, Mrs. Morgan engaged John T. Riely, Esq. to represent Morris with respect to his immigration problem.

Mr. Riely became the complainant in the disciplinary proceedings against Chisholm, and he represented Morris in a related civil action for legal malpractice. Riely was also a witness for Bar Counsel before the Hearing Committee. He testified that, upon being retained by Mrs. Morgan, he wrote to Chisholm at his last known address, but that the letter was returned as undeliverable. He also expended a considerable amount of effort to attempt to reach Chisholm by telephone, but was unsuccessful.

Unable to locate Morris' previously retained counsel, Riely filed a motion in the BIA proceeding for a stay of the deportation order and for reconsideration of the order dismissing Morris' appeal. The motion was based on Chisholm's ineffectiveness as Morris' attorney. On May 5, 1993, almost three months after Morris' arrest, Riely secured

---

4. Morris also testified that at some time between 1988 and 1990, he encountered Chisholm at the Montgomery County, Maryland courthouse. Morris claimed that he asked Chisholm whether he had heard anything further about Morris' immigration case, and that Chisholm responded that he had not. Chisholm recalled seeing Morris at the courthouse but denied that Morris approached him or talked with him.

5. A copy of the order dismissing the appeal was sent to Chisholm at the address indicated on the letterhead of his 1988 correspondence with Maggio. There is no evidence that Chisholm ever advised the INS, or the BIA, or Morris, or Mrs. Morgan, that he had changed his address.

his release on bond. On June 17, 1993, the BIA remanded the case to the immigration judge for reconsideration.

Michael Maggio, Morris' original immigration attorney, also testified before the Hearing Committee. He explained that following the immigration judge's entry of the deportation order, the only reasonable option available to Morris under the immigration statute was to appeal to the BIA. Maggio testified that he informed Chisholm that he (Maggio) had filed a notice of appeal, and that he advised Chisholm that Chisholm would have to pursue that appeal. Maggio further testified that he offered to assist Chisholm in any way that he could, but that Chisholm never requested any assistance.

Wayne Stogner, the BIA's Deputy Chief Attorney Examiner, testified as an expert witness on behalf of Bar Counsel. Stogner explained that it was necessary for Chisholm to file a brief in Morris' behalf in the BIA in order to protect Morris' rights. Stogner explained that failure to file such an appeal would preclude Morris from ultimately obtaining judicial review of the deportation order, because judicial review is available only if the alien has exhausted his administrative remedies. Stogner was also of the opinion that the filing of a brief would not have been futile, for achievement of a remand might have been possible in light of Morris' marriage and other factors. Stogner rejected the notion, advanced by Chisholm, that it was helpful to Morris to "put the case on hold" so that Morris could rehabilitate himself in the interim.

## III.

### CHISHOLM'S DEFENSE

Before the Hearing Committee, Chisholm gave what Bar Counsel has aptly characterized as "a bizarre explanation for his abandonment of Mr. Morris." Chisholm asserted in his opening statement:

I will prove that almost everything in this case is a fraud, perpetrated for the ploy of allowing a convicted drug offender to stay in the United States and sell his illegal wares and be able to go back to Jamaica because he is still a citizen of Jamaica and bring the drugs into the United States because he is going to have possibly a permanent residency here.

Chisholm stated that he had "the compunction any citizen would have about people who come into the country to sell drugs," and that he did not wish to "protect people who do that."

In the context of this unflattering assessment of his former client's cause, Chisholm made several contentions in his defense. First, he asserted that he was not retained to handle Morris' immigration case at all. Second, he claimed that Morris did not contact him upon his release from prison and would not cooperate with him. Third, Chisholm argued that an appeal to the BIA would have been futile because Morris had the burden of establishing that he had been rehabilitated, and Morris' criminal record was antithetical to the notion of rehabilitation. Chisholm also asserted that Morris was a "career criminal" who could not be believed.

Chisholm testified that he did not enter his appearance on Morris' behalf. He claimed that he had not yet accepted the case, and that Morris had never authorized him to represent Morris before the BIA. Chisholm asserted that he wanted to examine Morris' immigration file before deciding whether to represent Morris, but that he was unable to do so because Morris did not come to his office to sign a Form G–28.[6] When Chisholm was confronted with the receipt which he had given to Mrs. Morgan upon receiving an advance payment of $1,000 "for services in Immigration Case," he responded that he originally thought that he had been retained, but that his perception later changed because Morris would not come to see him. Chisholm acknowledged that he never informed anyone that he was not representing Chisholm in the immigration matter.

Chisholm also asserted that he had never agreed to file an appeal from the deportation

---

6. The reader will, however, recall Chisholm's claim that he had been unwilling to send the Form G–28 to Morris in prison because he did not trust Morris. See page 6, *supra*. Indeed, Chisholm never informed Morris or Mrs. Morgan that it would be necessary to sign such a form.

order against Morris. He claimed that Morris had not authorized him to do so, and that in light of Morris' criminal record, an appeal would have been frivolous in any event. Although Chisholm recalled speaking with Maggio over the telephone following Morris' release from prison, he denied that he told Maggio that he was taking over the immigration appeal.

Chisholm agreed that Morris called him on the morning after Morris' release from prison. He testified that he could not then assist Morris with his immigration problem because he had been unable to obtain Morris' file from the INS without a Form G–28. Without that file, Chisholm explained, he was unable to evaluate Morris' legal options. Chisholm asserted that thereafter, he was unable to contact Morris because he did not know Morris' address or telephone number.

Chisholm introduced into evidence copies of letters which he claimed to have sent to Morris on October 15, 1987, March 17, 1988, and August 3, 1988. In those letters, Chisholm purportedly instructed Morris to come to see him and to execute a G–28 form so that the representation could proceed. A serious question was raised at the hearing regarding the authenticity of these letters, and the Hearing Committee explicitly discounted them.[7]

7. The letter dated March 15, 1988 stated, *inter alia,* that "I had asked the Administration at Danbury [Prison] to give you bus fare to Maryland and I hope they did that; *but you have not called to tell me anything."* (Emphasis added). As we have noted, however, Chisholm testified that Morris did call him the morning after his release from prison. The Hearing Committee stated:
   The circumstances surrounding the appearance of [the three letters] caused at least some members of this [C]ommittee to suspect that those documents may have been created much more recently than their dates would indicate.

8. It appears that the difficulties encountered by Morris, Mrs. Morgan, and Riely in their attempts in 1993 to contact Chisholm were attributable to Chisholm's temporary retirement and the closing of his practice.

9. The Committee noted, *inter alia,* that Chisholm's characterization of Morris as a "career criminal" was an exaggeration, that Morris' last "standing conviction" was entered nearly fifteen

Finally, the Hearing Committee received evidence relating to Chisholm's physical and emotional health. Chisholm advised Bar Counsel in January 1993 that he was suffering from "incurable diseases and have some decrease in my brain functions." In 1993, facing an investigation by disciplinary authorities in Maryland for alleged neglect of a client matter, for charging an unreasonable fee, for pleading inaccurate and scandalous allegations, and for contempt of a California child support order, Chisholm agreed to be placed on inactive status in Maryland; Chisholm stated that his physical condition required him to retire from the active practice of law.[8] He took no similar action in the District. Chisholm was subsequently restored to active status in Maryland without any disciplinary action having been taken against him.

## IV.

## REPORT AND RECOMMENDATION OF THE HEARING COMMITTEE

The Hearing Committee explicitly credited the testimony of Bar Counsel's witnesses, including Morris[9] and Mrs. Morgan. The Committee questioned Chisholm's "general credibility" and expressly disbelieved his testimony that he had not been engaged to prosecute the immigration appeal and that Morris had failed to contact him.[10]

The Committee found:

years ago, that he had held a clerical job at George Washington University Hospital since 1988, that there was no evidence of drug involvement during the last seven years, and that most of Morris' testimony was corroborated by his sister. It also appears that Morris' employer held his job open for him for the three-month period during which Morris was in the custody of the INS.

10. The Committee stated, *inter alia:*
    The [C]ommittee also finds untrue respondent's allegations that upon release from prison Morris did not contact respondent and thus frustrated respondent's effort to represent him. Morris' sister, a college graduate employed as a laboratory supervisor at George Washington University and an obviously responsible and intelligent person, testified clearly as to the many difficulties which she had during 1987 in trying to reach respondent to discuss Morris' criminal case. There is no reason to think that respondent's treatment of Morris himself after

There is no evidence that from respondent's 1987 engagement by Morris until Morris was taken into custody [in 1993], respondent ever did anything to assist [Morris] with respect to his immigration problems. The [C]ommittee believes that ... Respondent never filed an appearance before either the INS or the Board of Immigration Appeals, never sought to review Morris' file, never filed a brief in Morris' matter, and never made any effort to see that Morris was not deported. Such misconduct was so pervasive and enduring that *this [C]ommittee concludes as a matter of fact that it was intentional.*

(Emphasis added; footnote omitted.)

After finding that Bar Counsel had proved, by clear and convincing evidence, that Chisholm had committed each of the disciplinary violations charged, the Committee turned its attention to the appropriate sanction. The Committee concluded that a six-month suspension was appropriate, though "a good argument could be made in these circumstances for an even longer suspension." The Committee continued:

[T]he most important element of the sanction here should be the inclusion of a requirement that respondent demonstrate rehabilitation prior to being reinstated after the suspension. Respondent has shown neither remorse nor an understanding of the seriousness of his misconduct. The record, moreover, contains numerous indications, including admissions by respondent, that he has been experiencing a series of personal crises. These include references to both medical and psychiatric problems.

\*　　\*　　\*　　\*　　\*　　\*

The attorney disciplinary system must focus not only on discipline of transgressors but also on their rehabilitation and the protection of the public. The requirement of proving fitness gives respondent an incentive for such rehabilitation. To be able to make the showing ultimately needed for reinstatement the respondent must focus on self-healing, rather than simply filling the time of the suspension and then automatically returning to the practicing bar. The [C]ommittee thus strongly recommends that the Board include in the sanction imposed herein a requirement of a showing of fitness before reinstatement.

(Footnotes omitted).[11]

## V.

## THE REPORT AND RECOMMENDATION OF THE BOARD

The Board adopted the Hearing Committee's findings and legal conclusions, and agreed with all of the Committee's recommendations as to sanction save one. With respect to what it characterized as the "close question" whether Chisholm should be required to demonstrate fitness as a condition of reinstatement, the Board wrote:

Respondent's misconduct was very serious, involving neglect of a case for over five years and persistent, intentional dishonesty, resulting in the needless incarceration of the client. It is not apparent that Respondent understands the seriousness of his misconduct. Before the Hearing Committee, he testified that he did his client a favor by failing to pursue the appeal, because the six-year delay occasioned by Respondent's inaction provided more time for Mr. Morris to become rehabilitated. In argument before the Board, Respondent argued that he was not even retained to handle the appeal before the BIA. Moreover, Respondent has taken no steps to remedy past wrongs, such as returning the retainer he received to handle Mr. Morris' appeal. However, we are persuaded that Respondent's misconduct was largely the product of accepting a case outside his area of expertise. He has no record of disciplinary violations in this jurisdiction,

he was released was any different than it had been towards his sister. *The [C]ommittee is persuaded that any failure to communicate was not the result of Morris' conduct but rather that of respondent.*
(Emphasis added).

11. The Hearing Committee, as we have noted, also recommended that the court order Chisholm to make restitution. The Hearing Committee's views as to Chisholm's health, character and competence are detailed in Part VI C, *infra.*

and we acknowledge his successful result in Mr. Morris' criminal proceedings. We accordingly conclude that a showing of fitness would be unwarranted.

## VI.

## LEGAL DISCUSSION

### A. *The Standard of Review.*

District of Columbia Bar R. XI § 9(g)(1) (1996) provides that "the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." Chisholm contends that the Board's findings lack adequate support in the record because, according to him, the Hearing Committee and the Board misunderstood the evidence. Bar Counsel, on the other hand, challenges the Board's proposed disposition. We deal with each party's contentions in turn.

### B. *Chisholm's Exceptions.*

■ Our standard of review, as described above, precludes us from sustaining Chisholm's exceptions. The Hearing Committee, which heard the witnesses and had the opportunity to observe their demeanor, found in Bar Counsel's favor on all of the significant contested issues of fact. Here, as in *In re Shillaire*, 597 A.2d 913, 916 (D.C.1991), "the Board has upheld the findings of the Committee, and these findings turn in substantial part on credibility determinations which we are in no position to second-guess."

Moreover, Chisholm's criticisms of the Committee's findings are unpersuasive. His claim that he was not retained to handle an appeal from the deportation order is refuted not only by the testimony which the Committee credited, but also by documentary evidence.[12] Moreover, it offends common sense to suggest that Chisholm could properly rep-

resent Morris in his immigration matter without pursuing an appeal from a live deportation order, when such a course of action could, inevitably would, and ultimately did lead to Morris' apprehension and incarceration by INS agents.

Chisholm's claim that he could not represent Morris because Morris could not be located is equally implausible. Chisholm acknowledged that he knew Mrs. Morgan's address and telephone number. Having accepted $1,000 for services in the immigration case, Chisholm was surely obliged at least to attempt to locate Morris through his sister. In any event, the Committee found, on the basis of more than adequate evidence, that it was Chisholm who tried to avoid Morris, and not the other way around.

Finally, Chisholm's theory that an appeal would have been futile was refuted both by the testimony of a ranking BIA official and of an experienced immigration attorney. Moreover, Chisholm, as we have noted, left a live deportation order intact, and Morris was imprisoned as a result. Chisholm's successor counsel, Riely, successfully sought relief from the deportation order and secured Morris' release after Morris had spent almost three months in custody as a result of Chisholm's abandonment of him. Chisholm cannot seriously argue that he could have done nothing for Morris when something *was* done for Morris when Riely took over the representation. If Riely was able to obtain Morris' liberty, then appropriate efforts by Chisholm could not have been futile.

### C. *Bar Counsel's Exceptions.*

#### (1) *General considerations.*

Bar Counsel disagrees with the Board's recommended sanction solely with respect to the appropriateness of requiring Chisholm to prove his fitness to practice law as a condition of reinstatement. Bar Counsel agrees with the view of the Hearing Committee that such a condition should have been imposed.

---

12. The receipt which Chisholm gave Mrs. Morgan was for his anticipated services "in Immigration Case." In one of the disputed letters to Morris which Chisholm presented to the Committee (and which Chisholm thus represented to

be genuine), he stated that Morris must sign certain documents "before I will be recognized as representing you *at Immigration Appeals.*" (Emphasis added).

District of Columbia Bar Rule XI § 3(a)(2) (1996) provides in relevant part that "[a]ny order of suspension may include a requirement that the attorney furnish proof of rehabilitation as a condition of reinstatement." This court has required proof of fitness in some cases involving neglect and related misconduct. *See, e.g., In re Steele,* 630 A.2d 196 (D.C.1993); *In re O'Donnell,* 517 A.2d 1069 (D.C.1986) (per curiam); *In re Stanton,* 470 A.2d 272 (D.C.1983) (per curiam). We have declined to do so in others. *See, e.g., In re Peek,* 565 A.2d 627 (D.C.1989); *In re Reback,* 513 A.2d 226 (D.C.1986) (en banc); *In re Whitlock,* 441 A.2d 989 (D.C.1982) (per curiam).[13] The discipline which this court has imposed for violations of the same proscriptions has varied, for the sanction in each case necessarily turns on the particular circumstances.

We do not believe that Bar Counsel has shown that adoption of the Board's recommendation would "foster a tendency towards inconsistent dispositions" within the meaning of Section 9(g)(1), for none of the prior cases is sufficiently similar to this one. We must therefore decide whether the recommended discipline is "otherwise unwarranted." *Id. Steele, supra,* 630 A.2d at 200.

### (2) Application of the Roundtree factors.

■ "In determining the proper sanction, our foremost concern is the need to protect the public, the courts, and the legal profession." *Steele, supra,* 630 A.2d at 200; *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc); *Reback, supra,* 513 A.2d at 231. "Although we have not yet undertaken to enunciate a precise standard as to when a fitness requirement should be imposed, ... our guidelines for evaluating petitions for reinstatement are instructive. Upon assessing a petition for reinstatement, we generally consider

(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law."

*Steele, supra,* 630 A.2d at 201 (quoting *In re Roundtree,* 503 A.2d 1215, 1217 (D.C.1985)). Application of the five *Roundtree* factors to the present case persuades us that Chisholm's reinstatement should be conditioned upon a showing of fitness, and that to permit a sanction which does not include such a requirement would be "unwarranted" within the meaning of D.C. Bar R. XI § 9(g)(1).

### (a) Nature and circumstances of the misconduct.

The Board found that Chisholm's misconduct was "very serious," that he neglected Morris' case for over five years, and that he engaged in "persistent, intentional dishonesty, resulting in the needless incarceration of the client." We agree with the Board's assessment in this regard.

### (b) Whether the attorney recognizes the seriousness of the misconduct.

In the view of the Board, it is "not apparent that Respondent understands the seriousness of his misconduct." The Board noted Chisholm's testimony that he did his client "a favor" by failing to pursue the appeal. The Hearing Committee stated:

Respondent has not shown any remorse with respect to his conduct or indicated that he understood the seriousness of what has happened here. This attitude is typified by respondent's argument that his

---

13. In its brief, counsel for the Board relies heavily on several decisions in serious neglect cases in which the court imposed six-month suspensions not conditioned on a showing of fitness, even where, *e.g.,* a respondent had forged a signature on a pleading and falsified a notarization, *see Reback, supra,* 513 A.2d at 228, or failed to file briefs in two criminal cases notwithstanding the warnings of the court, *Whitlock, supra,* 441 A.2d at 990–91. These cases, however, do not provide substantial support for the Board's position. At the time *Reback* and *Whitlock* were decided, D.C. Bar R. XI § 3(a)(2) authorized the court to require proof of fitness only where the suspension was for more than one year. *Steele, supra,* 630 A.2d at 199–200 n. 3. In 1989, the Rule was amended to permit the court to impose such a requirement in conjunction with an order suspending an attorney from practice for a period of any length. *Steele, supra,* 630 A.2d at 199.

failure to do anything gave Morris "six years of rehabilitative time ... [a]nd maybe he doesn't realize it." Respondent utterly ignores the fact that Morris was jailed and nearly deported as a result of respondent's failures.

We agree.

> *(c) The attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones.*

So far as we are aware, Chisholm has incurred no further disciplinary charges since Riely replaced him as counsel for Morris. The Board explicitly found, on the other hand, that Chisholm "has taken no steps to remedy past wrongs, such as returning the retainer he received to handle Mr. Morris' appeal." The record supports the Board's finding.

> *(d) The attorney's present character.*

Chisholm has no record of discipline in this jurisdiction, and the allegations against him in Maryland did not result in an adjudication that he had engaged in professional misconduct in that jurisdiction. It is significant on the other side of the scale, however, that the Hearing Committee did not believe some of the testimony which Chisholm gave under oath.[14]

> *(e) The attorney's present qualifications and competence.*

The Hearing Committee addressed in some detail Chisholm's present qualifications and competence. The Committee accurately noted that the record "contains numerous indications, including admissions by respondent, that he has been experiencing a series of personal crises," including both medical and psychiatric problems. The Committee further found that Chisholm,

> not surprisingly, did not seem to be able to deal with his problems fully and consistently, as he voluntarily ceased practicing in Maryland (stating that he was retiring)

but took no similar actions in the District of Columbia. While respondent at the end of the case submitted some meager evidence that purported to support his recovery, it was too conclusory to be given substantial weight.

In the Committee's view, "[t]he effect of the medical evidence submitted by both parties is to create a substantial issue as to the physical and mental condition of the respondent, which the [C]ommittee believes remains unresolved on the record before us."

We consider these findings to be quite significant in relation to the question whether proof of rehabilitation should be required. It should be noted that the members of the Hearing Committee observed Chisholm in person, and we believe that their assessment of these rather sensitive issues merits considerable weight.[15]

> *(3) The Board's analysis.*

The Board, as we have noted, found the question whether a fitness requirement should be imposed to be a close one. In resolving that question in Chisholm's favor, the Board expressed the view that Chisholm's misconduct "was largely the product of accepting a case outside his area of expertise." The Board also "acknowledge[d] [Chisholm's] successful result in Mr. Morris' criminal proceedings" and noted that he had not previously been disciplined in the District of Columbia. We respectfully disagree with the Board's analysis.

It is true that Chisholm lacked expertise in immigration matters, but the record does not bear out the notion that this was the cause of his misconduct. As the Board itself explicitly found, the record demonstrates "persistent" and "intentional" dishonesty on Chisholm's part. There is no rational nexus between repeated acts of dishonesty and an attorney's lack of specialized expertise. Moreover, Chisholm was offered assistance and advice by Morris' prior attorney, but failed altogether to act upon it. Finally,

---

**14.** In rejecting a requirement of proof of fitness, the Board did not address Chisholm's present character at all, except to note the absence of any record of prior discipline.

**15.** Unfortunately, the Board did not address this issue at all, nor did it comment on the Committee's quite compelling findings.

Chisholm's failure to acquaint himself with even the most rudimentary aspects of immigration practice[16] compounded his misconduct, rather than excusing it.

The Board's reliance on Chisholm's representation of Morris in his criminal case stands on no firmer footing. The two representations were independent of one another, and each was separately compensated. The complete abandonment of a client in an immigration matter cannot be excused, wholly or partially, by counsel's satisfactory representation of that client in a different case. Here, that abandonment inexorably led to the loss of Morris' liberty for a significant period of time.

Moreover, Morris' convictions were vacated, and the criminal charges against Morris were dismissed, *on motion of the United States* as a result of police misconduct in the Fourth District Vice Unit. That dismissal was not contingent upon the quality of Chisholm's work. Under these circumstances, the success of Chisholm's representation was, at least in some measure, fortuitous. In according substantial weight to Chisholm's "successful result" in the criminal case, the Board evidently failed to consider or mention the most important circumstance that led to that result.

Chisholm's lack of prior discipline in the District is undoubtedly a legitimate factor in the disciplinary calculus.[17] In our view, however, this factor is significantly outweighed by the evidence relating to the other *Roundtree* factors, two of which the Board did not address at all.

# VII.

## CONCLUSION

This is a case in which the Hearing Committee and the Board found both protracted neglect and extensive dishonesty. Such a combination has warranted severe sanctions. *See Stanton, supra,* 470 A.2d at 280 (citing authorities). Considering the number of disciplinary rules that Chisholm violated, the severity of his misconduct, the fact that it was intentional, his protracted and continuing dishonesty, his refusal to accept responsibility for his actions, his lack of contrition, and the Hearing Committee's assessment of Chisholm's condition and character, we are convinced that Chisholm should be required to demonstrate his fitness to practice as a precondition to reinstatement. Although the discipline recommended by the Board is entitled to considerable weight, our quite substantial disagreement with the Board's reasons for its recommendation, and the Board's own view that the issue is a close one, persuade us that in this case, the omission of a fitness requirement would be unwarranted.

Accordingly, Charles E. Chisholm is suspended from the practice of law in this jurisdiction for six months. Within sixty days of the date of this order, Chisholm shall make restitution to Dorothy Morgan of $1000 plus interest at the legal rate of six percent[18] from September 2, 1987, the date she paid Respondent's legal fee. *See In re Dietz,* 633 A.2d 850, 851 (D.C.1993). Chisholm's reinstatement is conditioned on his filing with the

---

**16.** The Hearing Committee noted that in a letter which Chisholm wrote to Morris' prior counsel, Maggio, in February 1988, Chisholm

> made no distinction between the INS and the Board of Immigration Appeals. The two agencies are independent of each other. The former is the prosecutor of immigration law violations and the latter is the adjudicator of those prosecutions. At some point in the hearing before this [C]ommittee, respondent seemed to contend that he never intended to pursue an immigration appeal but rather sought to deal with the INS as a prosecutor. This [C]ommittee finds that contention not to be credible. Rather, this [C]ommittee believes that respondent, whose prior experience included only "one or two little" immigration cases, did not know the difference between those agencies, at

the outset did not know what he was to do, and never sought to find out what he really was to do until this complaint was filed. Even if he did intend to solve Morris' immigration problems through negotiations with the INS as prosecutor, he still would have had to deal with the pending appeal process or at least advise Morris that the scope of his engagement did not include the appeal. Irrespective, plans should be made by respondent to deal with that appellate proceeding.

**17.** We note, however, that disciplinary charges against Chisholm in Maryland were discontinued after he voluntarily closed his practice there.

**18.** *See* D.C.Code § 28–3302(a) (1996).

Board on Professional Responsibility of proof that he has taken all reasonable steps to comply with the restitution order. Chisholm's reinstatement is also conditioned on his proof of fitness to practice law. We direct Chisholm's attention to Section 14 of District of Columbia Bar Rule XI, governing disbarred and suspended attorneys.

*So ordered.*