**In re K. Duff LEWIS, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 96–BG–1013.**

District of Columbia Court of Appeals.

Submitted Jan. 7, 1997.
Decided Feb. 6, 1997.

Before TERRY and KING, Associate Judges, and PRYOR, Senior Judge.

PER CURIAM:

The Board on Professional Responsibility found that respondent K. Duff Lewis failed to represent his client in violation of Rules 1.1(b), 1.3(a) and (b)(1), 1.16(a), and 8.4(d). The Board's attached Report and Recommendation describes the underlying facts and proposes a thirty-day suspension and a showing of fitness for reinstatement.

Neither Bar Counsel nor respondent took exception with the Board's recommended sanctions. Respondent does not dispute the Board's factual findings; we adopt the sanctions. *See* D.C. Bar R. XI, § 9(g). We accordingly suspend respondent for thirty days and require a showing of fitness for reinstatement.

*So ordered.*

## APPENDIX

### DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of K. Duff Lewis, Esquire, Respondent.

Bar Docket No. 105-94.

### REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

Hearing Committee Number Nine conducted a one-day hearing and concluded that Respondent violated Rules 1.1(a), 1.1(b), 1.3(a), 1.3(b), 1.16(a), and 8.4(d) of the D.C. Rules of Professional Conduct in his representation of a defendant in a federal felony case. Respondent conceded the violations and stipulated to the underlying facts. The Hearing Committee recommended a three-month suspension with a showing of fitness required for reinstatement. Neither Bar Counsel nor Respondent took exception before the Board to the Hearing Committee's recommendation. For the reasons stated below, the Board agrees with all but one of the violations found and recommends a 30–day suspension with a showing of fitness required for reinstatement.

### FACTS CONCERNING THE VIOLATIONS

Respondent is a member of the District of Columbia Bar, having been admitted on September 16, 1985. Respondent's practice consisted largely of court-appointed representations of criminal defendants in the federal courts in the District of Columbia.

On or about January 20, 1990, Respondent agreed to represent John Stemple in a criminal investigation, and with respect to litigation that might arise out of a criminal investigation in multiple jurisdictions, concerning Mr. Stemple's activities as a licensed dealer in firearms. Respondent and Mr. Stemple signed a Retainer Agreement, by which Mr. Stemple agreed to pay Respondent $125 per hour for work outside of court and $175 for work done in court, plus expenses. Bar Ex. 4. Mr. Stemple agreed to pay a $5,000 retainer. Respondent agreed to provide monthly bills for his services.

Respondent thereafter entered his appearance as counsel of record for Mr. Stemple in *United States v. Stemple,* CR90–40025 in the United States District Court for the Southern District of Illinois (Rock Island) and in 92–CR–80770–02–DT, in the United States District Court for the Eastern District of Michigan (Detroit). Respondent entered his appearance in the Michigan matter *pro hac vice* on September 30, 1992, representing that he was in good standing with the District of Columbia Bar. Bar Ex. 7. At that time, however, Respondent was suspended for failure to pay Bar dues. He remained suspended from 1988 until November 1994. Bar Ex. 1.

The Hearing Committee found that "[t]hrough the efforts of Respondent," the Illinois matter against Mr. Stemple was dismissed. In the Michigan matter, Respondent appeared at an arraignment for Mr. Stemple on October 1, 1992, "but failed to appear at subsequent hearings or to communicate with the court." Hearing Committee

Report at 2. Neither Mr. Stemple nor counsel for co-defendants could find Respondent. The court set December 14, 1992 as a deadline for filing motions. Respondent failed to file motions on Mr. Stemple's behalf, although non-frivolous motions were available. Mr. Stemple attempted to reach Respondent, without success, to learn whether he was expected to attend a scheduled hearing on motions. On July 23, 1993, the court's copy of a notice of hearing addressed to Respondent was returned as undeliverable.

On October 19, 1993, Robert E. Sanders filed a motion to enter his appearance in the Michigan matter on behalf of Mr. Stemple. The court granted the motion, and granted Mr. Sanders an extension of time to file pretrial motions on Mr. Stemple's behalf. Mr. Sanders filed such motions in January of 1994. The Hearing Committee found that "[w]hile Respondent did not contact Mr. Stemple or Mr. Sanders, Respondent's inaction in the case does not appear to have caused any material prejudice (other than delay) to Mr. Stemple's case." Hearing Committee Report at 3.

This matter came to Bar Counsel on a complaint filed by Mr. Stemple. Mr. Stemple claimed that he paid Respondent $30,000. Bar Ex. 2. While the canceled checks attached to the complaint are not completely clear, they appear to verify payments of at least $25,000. Bar Ex. 3.

The record shows there were two significant pressures on Respondent during the period that he abandoned Mr. Stemple. The first was his representation of a defendant in a capital case in Texas. Although Respondent was a sole practitioner whose case load and income were derived almost exclusively from court-appointed criminal defense cases, he took on a capital case in Texas. In that matter he engaged in habeas corpus proceedings at the local trial court level, appealed the case three times to the Texas Court of Criminal Appeals, *see Montoya v. State*, 744 S.W.2d 15 (Tex.Cr.App.1987), three times to the United States Court of Appeals for the Fifth Circuit, *Montoya v. Collins*, 955 F.2d 279 (5th Cir.1992); *Montoya v. Collins*, 959 F.2d 969 (5th Cir.1992); and *Montoya v.*

*Collins*, 988 F.2d 11 (5th Cir.1993), and four times to the United States Supreme Court. *Montoya v. Collins*, 506 U.S. 1036, 113 S.Ct. 820, 121 L.Ed.2d 692 (1992); *Montoya v. Texas*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *Montoya v. Texas*, 507 U.S. 947, 113 S.Ct. 1358, 122 L.Ed.2d 738 (1993); and *Montoya v. Collins*, 507 U.S. 1002, 113 S.Ct. 1630, 123 L.Ed.2d 263 (1993). Respondent's client was executed by lethal injection at midnight on March 24/25, 1993.

The record also showed that in July 1991, the United States District Court for the District of Columbia administratively "purged" its CJA list, with the creation of the new Office of the Federal Public Defender. Respondent had to reapply for eligibility, and the pool of available cases dropped significantly since most were handled by the Federal Public Defender. Respondent's court-appointed caseload plummeted.

The combination of this economic crisis in his practice, and the emotional strain and exhaustion of the capital case, left Respondent severely depressed. Tr. 81. Respondent unilaterally "suspended himself" from the practice of law and abandoned Mr. Stemple and his case. Tr. 58. Respondent did not seek treatment for his depression, but testified to the Hearing Committee that he believes he is not currently depressed and is stable. Tr. 85–86. The Hearing Committee found that "[s]ince the U.S. Supreme Court decision in the *Montoya* case, Respondent has not practiced law, has moved to Baltimore and gotten married." Hearing Committee Report at 8. Respondent does not intend to resume the practice of law, but expects to pursue a career as a professional golfer.

## THE VIOLATIONS FOUND BY THE HEARING COMMITTEE

The Hearing Committee found that Respondent violated Rules 1.1(a) and (b), 1.3(a) and (b)(1), 1.16(a) and 8.4(d). The Board agrees that the Respondent lapsed in his representation of Mr. Stemple with respect to Rules 1.1(b), 1.3(a) and (b)(1), 1.16(a) and 8.4(d).

A. *Rule 1.1(a) and (b)*. Rule 1.1(a) requires a lawyer to provide "competent representation" to a client. Rule 1.1(b) requires a lawyer to serve a client with "skill and care commensurate with that generally afforded to clients by other lawyers in similar matters." It is clear that Respondent did not meet his obligation to represent Mr. Stemple with the skill and care commensurate with that generally afforded to clients in federal criminal defense matters. Because there is no evidence that lack of competence was at issue, however, we conclude that Respondent violated Rule 1.1(b) but not Rule 1.1(a).

Respondent entered his appearance as counsel for Mr. Stemple in a felony criminal case. His client potentially faced decades of imprisonment if convicted. Respondent nonetheless allowed a deadline to pass for filing of motions, although non-frivolous motions were available to his client. He simply ceased to make efforts on his client's behalf, although the case was pending trial.

Representation of a criminal defendant in a complex, multi-defendant federal case obviously requires diligence in investigation of the facts, and in pressing available legal arguments through every stage of the proceedings. Respondent did neither. There came a point in the representation when he simply "ran away," without so much as a telephone call to the client. This conduct clearly violates Rule 1.1(b). *See In re Lyles*, 680 A.2d 408, 416–17 (D.C.1996); *In re Sumner*, 665 A.2d 986, 989 (D.C.1995).

It is not true in every case, however, that failure to represent a client with skill and care is related to a lack of competence in the representation. There was no evidence whatever before the Hearing Committee that Respondent lapsed because he was not competent to defend a complex federal criminal case. To the contrary, Respondent succeeded in having the case against Mr. Stemple dismissed in Illinois. Respondent apparently enjoyed a successful practice as court-appointed defense counsel in the federal courts. There is no suggestion in the record that Respondent was in over his head in the Stemple matter; he simply walked away from it. The Board concludes that Rule 1.1(b) and 1.3 violations are better tailored to address the situation in which a lawyer capable to handle a representation walks away from it for reasons unrelated to his competence in that area of practice. Indeed, the Hearing Committee noted in its discussion of the Rule 1.3 violations that "Respondent was an experienced criminal defense attorney who knew the ethical and professional responsibilities to his client and the court." Hearing Committee Report at 5.

This is a different case from *Sumner*, for example, where the respondent had never handled a criminal appeal before. The respondent in *Sumner* walked away from that matter as well. Violations of both Rule 1.1(a) and (b) were established, because the failure to represent the client with skill and care was a product of his lack of competence in criminal appellate practice. That is not true in this case.

B. *Rule 1.3(a) and (b)(1)*. Rule 1.3(a) requires an attorney to represent a client zealously and diligently within the bounds of the law. A respondent can violate Rule 1.3(a) without an intent to do so. The failure to take action for a significant time to further a client's cause, whether or not prejudice to the client results, violates this Rule. *In re Dietz*, 633 A.2d 850 (D.C.1993). Respondent clearly violated Rule 1.3(a) when he failed to file motions and to make himself available for court proceedings and client consultation.

Rule 1.3(b)(1) provides: "A lawyer shall not intentionally fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules." Proof of a violation of Rule 1.3(b)(1) requires a finding that Respondent intentionally failed to seek his client's lawful objectives. Neglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter, or the neglect is so pervasive that the lawyer must be aware of it. *In re Reback*, 487 A.2d 235, 240 (D.C. 1985), *rev'd on other grounds*, 513 A.2d 226 (D.C.1986) (*en banc*). Knowing abandonment of a client is the classic case of a Rule 1.3(b)(1) violation, and that is precisely what Respondent did to Mr. Stemple in the Michigan case.

C. *Rule 1.4(a)*. Rule 1.4(a) requires that: "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." This is an egregious case of a Rule 1.4(a) violation. There came a point where Respondent could not even be found by his client, counsel for co-defendants, or the court. Respondent failed not only to keep his client informed about the status of the case, but about his own intent to abandon the representation.

D. *Rule 1.16(d)*. Rule 1.16(d) provides: "In connection with the termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee that has not been earned." The findings of fact made by the Hearing Committee establish that Respondent failed to give notice to Mr. Stemple when he terminated the representation, that he did not allow time for Mr. Stemple to find successor counsel before deadlines passed in the criminal case, and that he never surrendered Mr. Stemple's files or any unearned fee. Mr. Stemple's file apparently was lost when Respondent was evicted from his apartment in October 1993. Respondent took no action from the time the representation ended until the eviction to provide the file to the client. We agree with the Hearing Committee, which concluded that "[a]ll of these failures, individually and collectively, form the basis of the Rule 1.16(d) violation." Hearing Committee Report at 6.

E. *Rule 8.4(d)*. The Hearing Committee also concluded, and we agree, that Respondent's failure to be available to the court in a matter in which he had entered his appearance violated the prohibition against conduct that seriously interferes with the administration of justice. Respondent failed to provide an accurate address to the court, so he did not appear for a scheduled motions hearing. Because Respondent did not withdraw, the client and court encountered a lengthy delay while they tried to locate Respondent. When the client finally realized he had been abandoned, his successor counsel had to seek more time in which to file motions in order to protect the client's interests. Such unresponsiveness to the court violates Rule 8.4(d). *See In re Delate*, 579 A.2d 1177 (D.C.1990); *In re Alexander*, 496 A.2d 244, 255 (D.C. 1985); *In re Burka*, 423 A.2d 181 (D.C. 1980)(all decided under predecessor DR 1–102(A)(5)).

## RECOMMENDED SANCTION

Bar Counsel and Respondent stipulated that the appropriate range of sanction in this matter was a suspension of between two and six months. In post-hearing briefing to the Hearing Committee, Bar Counsel advocated a period of suspension of at least two months, and Respondent recommended a one- to two-month suspension. The Hearing Committee recommended a three-month suspension with a requirement that Respondent show fitness before reinstatement.

Although neither Respondent nor Bar Counsel took exception to the Hearing Committee's recommended sanction, the Board has reviewed the sanction issue carefully because of our obligation to recommend consistent discipline for comparable conduct. D.C.App. R. XI, sec. 9(g). It is unusual for a suspension to be imposed for a first violation that sounds largely in neglect, with no proven violations involving dishonesty; it is even more unusual for a fitness requirement to be imposed for a first, and only, such violation.

We have analyzed the appropriate sanction under the standards articulated by the Court:

In determining what sanction may be appropriate under the circumstances, there are several factors that need to be considered. These include the nature of the violation, the mitigating and aggravating circumstances, the need to protect the public, the courts and the legal profession, and the moral fitness of the attorney to the extent we can discern it. [*In re Ryan*, 670 A.2d 375, 380 (1996).]

Upon review of these circumstances, the Board concludes that a 30-day suspension is appropriate on this record. Respondent has

no prior discipline, and has been very contrite and cooperative in this process. *See* Tr. 63("I put my heart and soul into doing good work for my clients for a lot of years, and this time I made a big mistake, and I regret that tremendously.... I apologize to the bar for the embarrassment I've caused it and to my former client, Mr. Stemple. What I did was wrong.")

On the other hand, Respondent's conduct in Mr. Stemple's case demonstrates more than just lack of the care and skill expected of criminal defense counsel. He abandoned his client, and then did nothing to inform or protect the client. The Hearing Committee found, and we agree, that this rose to the level of an intentional violation. It would have taken no more than a telephone call for Respondent to put Mr. Stemple on notice that he was, as a practical matter, no longer represented. Because Respondent's abandonment of Mr. Stemple ripened into an intentional violation, and was accompanied by companion violations of serious interference with the administration of justice, failure to keep the client informed, and failure to return the property of the client, the Board concludes that a period of suspension is justified.

A comparison with *In re Sumner*, a recent case in which the Court imposed a 30–day suspension for abandonment of a client during a criminal appeal, is useful. The Respondent here and Sumner both abandoned their clients. Both were first offenders in the disciplinary system, in cases involving that single, abandoned client. Both also failed to return the client file and to keep the client informed, in violation of Rules 1.16(d) and 1.4(a).

In this case, the Respondent's abandonment of the client amounted to an intentional violation under Rule 1.3. In *Sumner*, the hearing committee rejected alleged Rule 1.3 violations, and no exception was taken by Bar Counsel.

The Respondent in this case, however, was not found to have engaged in conduct involving dishonesty. The record shows that Respondent here did not pay Bar dues from 1988 to 1994, and inaccurately stated that he was in good standing when he entered his appearance in the Michigan federal court matter. No misconduct was charged based on that statement, although we consider such circumstances in aggravation for purposes of sanction. In *Sumner*, the dishonesty was more serious. The respondent in *Sumner* told the client that he had taken steps to perfect the appeal, when he had not.

Sumner was inexperienced in criminal appellate work; Respondent was quite experienced. Both Respondent and Sumner suffered episodes of depression at the time of the abandonment of the client. Clients in both cases were put at risk of serious prejudice, but neither experienced actual prejudice, other than delay.

While each case is different on its facts, we conclude that, for sanction purposes, this is a case comparable to *Sumner*. Dishonesty was not charged and proven here, but the circumstances of this case require a brief suspension in order "to protect the public, the courts, and the legal profession." *In re Haupt*, 422 A.2d 768, 771 (D.C.1980) The abandonment of a client under any circumstances is grave, but at the trial stage of a criminal proceeding, it is dire. Respondent knew what to do to protect his client's interests, and intentionally chose not to take those steps, although he was paid a substantial retainer.

This case is as serious as others in which the Court has ordered a 30–day suspension. *See In re Banks*, 577 A.2d 316 (D.C.1990) (30–day suspension for neglect of personal injury matter, resulting in client's loss of cause of action); *In re Dory*, 552 A.2d 518 (D.C.1989) (30–day suspension for neglect of probate matter that amounted to "doing virtually nothing" for three years); *In re Dory*, 528 A.2d 1247 (D.C.1987) (30–day suspension for neglect and intentional failure to carry out agreement with client by failing to file appeal or motion for new trial in personal injury case). The conduct here is less egregious than some in which the Court has imposed longer suspensions. *See In re Stanton*, 470 A.2d 281 (D.C.1983) (60–day suspension for one instance of neglect and two instances of intentional failure to seek the

client's lawful objectives in two criminal cases); *In re Landesberg,* 518 A.2d 96 (D.C. 1986) (60–day suspension for keeping unearned legal fee and neglect of appeal from adverse paternity determination, misrepresentation to client, and failing to return file).

The fitness issue is more difficult. The Court recently observed that it has ordered a showing of fitness for reinstatement "in some cases involving neglect and related misconduct," but has "declined to do so in others." *In re Chisholm,* 679 A.2d 495, 503 (D.C.1996) The Court in *Chisholm* explained that it "may be instructive" in weighing whether fitness is appropriate to review the factors that the Court would examine in considering a petition for reinstatement. *See Chisholm,* 679 A.2d at 503, citing *In re Steele,* 630 A.2d 196, 200 (D.C.1993). The factors that the Court would consider upon a petition for reinstatement generally include:

(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law. [*In re Roundtree,* 503 A.2d 1215, 1217 (D.C. 1985).]

(1) We have described above in detail the nature and circumstances of the misconduct.

(2) The Respondent evidently recognizes the seriousness of the misconduct. Respondent was contrite and cooperative throughout the disciplinary process.

(3) The record is not clear on the steps taken to remedy past wrongs. The client's file was lost in 1993 when Respondent was evicted from his home, and so cannot be returned. Respondent has not made any repayment to Mr. Stemple. Tr. 76. He apparently did not keep time records that would permit a hearing committee to determine whether he earned all of the fee he was paid, and the Hearing Committee in fact made no recommendation as to restitution.

This is a factor that the Board concludes should be deferred in this case until any petition for reinstatement because of the unsatisfactory state of the record on this issue.

(4) While the record on character is unlikely to be fully developed in a violation proceeding, the record contains a statement signed by 20 members of the Bar attesting to Respondent's good character.

The Board's greatest concern about the fitness of Respondent to practice law can perhaps be considered under the fifth category, "present qualification and competence." Respondent had an extreme reaction in 1992 and early 1993 to the reversals in his practice and the execution of his client in the death penalty case. By Respondent's own admission, he "suspended himself" and was unable to continue practicing. The Board has no doubt that the loss of a client at the end of a hard-fought death penalty case, when the attorney involved has been defending the case almost completely alone, is devastating. Yet Respondent left his life and practice behind at that point. He was evicted from his home and his belongings were left in the street. Tr. 58–60. The record suggests that Respondent has functioned as a highly capable defense attorney, and could do so again. Respondent, however, has received no medical help for what he termed his "depression." Tr. 81.

The Hearing Committee, which had an opportunity to see and question Respondent, raised the fitness issue *sua sponte* because of its concern about Respondent's untreated depression. We give significant weight to the Hearing Committee's concern.

A second factor bearing on "qualification and competence" is the fact that Respondent has stated his intention not to practice law again "in the foreseeable future." Tr. 62. At this writing, he has not practiced for over three years. It could be years, or decades, before Respondent for some reason decides to resume practice. The protection of the public counsels in favor of a process that requires Respondent to demonstrate his competence *at the time* he wants to resume practice.

The Court has required a showing of fitness following a period of suspension as short as 30 days. *See In re Roxborough,* 675 A.2d 950 (D.C.1996); *In re Lockie,* 649 A.2d 546 (D.C.1994); *In re Smith,* 649 A.2d 299 (D.C.1994). In *Chisholm* itself, the Court added a requirement that respondent show fitness before reinstatement following a six-month suspension, although the respondent had no previous disciplinary history, in light of the seriousness of the neglect involved, the fact that it rose to the level of an intentional violation, and the presence of related dishonesty. *Chisholm,* 679 A.2d at 503–05.

We are mindful that a showing of fitness lengthens the effective suspension period. *See In re Steele,* 630 A.2d at 201 n. 5. In this type of case, where the likelihood of reinstatement seems remote, the risk that Respondent may experience some delay when he tries to return to practice is small compared to the need to protect the public, given the potential length of his absence from practice and his untreated depression.

## CONCLUSION

For all of the foregoing reasons, the Board recommends that Respondent be suspended from the practice of law in the District of Columbia for 30 days, with a showing of fitness required before reinstatement.

BOARD ON PROFESSIONAL RE-SPONSIBILITY

———

By: Patricia A. Brannan

July 30, 1996

All members of the Board concur in this Report and Recommendation.