*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-BG-600

IN RE ANITHA W. JOHNSON, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia
(Bar Registration No. 495672)

On Report and Recommendation
of the Board on Professional Responsibility
(Disciplinary Docket Nos. 2010-D551 et al.)
(Board Docket No. 18-BD-058)

(Argued March 16, 2022                                    Decided July 27, 2023)

*John O. Iweanoge, II*, for respondent.

*Myles V. Lynk*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, was on the brief, for the Office of Disciplinary Counsel.

Before BLACKBURNE-RIGSBY, *Chief Judge*, SHANKER,* *Associate Judge*, and THOMPSON, *Senior Judge*.

SHANKER, *Associate Judge*: In this bar disciplinary matter, the District of

Columbia Board on Professional Responsibility ("Board") concluded in a Report

---

* On June 2, 2023, Associate Judge Shanker was substituted for Associate Judge Beckwith. *See* Administrative Order 3-23.

and Recommendation, following review of a Report and Recommendation by an Ad Hoc Hearing Committee ("Committee"), that Respondent Anitha W. Johnson violated over 20 District of Columbia Rules of Professional Conduct in connection with five separate client matters over the course of seven years and recommended that she be disbarred for "flagrant dishonesty and indifference to her clients." Ms. Johnson filed exceptions to the Board Report and Recommendation in this court. After Ms. Johnson filed her exceptions, and after considering Ms. Johnson's response to an order to show cause, this court suspended Ms. Johnson from the practice of law in the District of Columbia pending final disposition of this proceeding. *See* D.C. Bar R. XI, § 9(g).

Ms. Johnson argues that the consideration of expert testimony at her Committee hearing deprived her of the right to a fair hearing, challenges the Board's findings of fact and conclusions of law, and contests the Board's recommended sanction of disbarment. We conclude that Ms. Johnson was not deprived of her right to a fair hearing; that the facts found by the Committee and upheld by the Board are supported by substantial evidence of record; that Ms. Johnson committed the charged violations of the Rules of Professional Conduct; and that the recommended sanction is warranted based on Ms. Johnson's flagrant dishonesty. We therefore order that Ms. Johnson is disbarred from the practice of law in this jurisdiction.

## I.     Factual Background and Procedural History

### A.     Factual Background

Ms. Johnson was admitted to the District of Columbia Bar in 2006 and has no prior record of professional discipline.  This case arose out of her conduct in five separate client matters and her financial record-keeping and commingling.  The Committee heard evidence on the alleged rule violations and made the following factual findings under a clear-and-convincing-evidence standard.[1]

#### 1.     Count 1: Police Misconduct Case Filed on Behalf of the Rudders, Ms. Goss, and Their Children

In June 2008, Roger and Rosena Rudder, their five-year-old daughter, Mr. Rudder's sister Noverlene Giselle Goss, and Ms. Goss's 15-year-old daughter ("the Rudders") attended an annual parade celebrating the culture of Trinidad.  Following

---

[1] The Board concurred with the factual findings as supported by substantial evidence in the record.  Ms. Johnson takes exception to many of the findings.  We address those exceptions in the Discussion; because we conclude that the findings are supported by substantial evidence of record, *see infra*, we accept them for purposes of this recitation.

an altercation with the District of Columbia police, all three adults and Ms. Goss's daughter were arrested.  The adults accepted diversions in their criminal cases.

The Rudders claimed that they were subjected to excessive force by the police, including the striking and mishandling of the minor children, and in October 2008 they met with Ms. Johnson about filing a civil action against the police.  Ms. Johnson falsely told the Rudders that she had successfully handled several police misconduct matters; in fact, she had not previously litigated an excessive force case.  Thinking that Ms. Johnson "[knew] what she [was] doing," the Rudders signed a contingency fee agreement with Ms. Johnson.

The Rudder family had two potential causes of action: District of Columbia common-law claims against the individual police officers and federal civil rights claims under 42 U.S.C. § 1983.  The common-law claims were generally easier to establish, but they had a one-year statute of limitations, although that was tolled for minors until they reached the age of 18.  D.C. Code §§ 12-301, 13-302.  The Section 1983 claims had a three-year statute of limitations but imposed heightened pleading standards and provided a qualified immunity defense for individual defendants and a defense for the governmental entity that the officers acted contrary to policy or custom.  Ms. Johnson was not aware of these principles.

The Rudder family provided Ms. Johnson with the names of witnesses and leads to obtain possible video of the incident. Ms. Johnson, however, "kind of blew it off a little," telling the Rudders that that was "something for later." She failed to take steps to secure eyewitness testimony or video footage. Later, Ms. Johnson told the Rudders and Ms. Goss to contact the witnesses themselves. An expert in police misconduct cases opined that Ms. Johnson's failure to investigate the case was a "fatal, fatal mistake."

In November 2009—more than a year after being retained and 17 months after the incident—Ms. Johnson filed a complaint in federal court on behalf of the Rudders against the District of Columbia and two named police officers. Ms. Johnson testified at the Committee hearing that in drafting the complaint she "combined a complaint where [she] saw various causes of actions, and [she] just put them in there." She later told Disciplinary Counsel that the "main count" was the Section 1983 claim and that "[a]ll other [common-law] claims was [sic] just added to the complaint." The common-law claims for the adults were barred because they were filed outside the statute of limitations. The minors' common-law claims, however, were tolled, so they were still viable. Ms. Johnson did not have the statute of limitations "on [her] mind" when she filed the complaint.

The defendants moved to dismiss the adults' common-law claims on statute-of-limitations grounds and the Section 1983 and some of the constitutional claims for failure to plead sufficient facts. The defendants explicitly acknowledged that the minors' common-law claims were not barred by the statute of limitations. Ms. Johnson, however, expressly conceded the lack of viability of the entire common-law case and filed a proposed order providing for the dismissal of all of the common-law claims. The D.C. Circuit later called this move "inexplicabl[e]." *Rudder v. Williams*, 666 F.3d 790, 793 (D.C. Cir. 2012). And even after the defendants pointed out the error in their reply brief, Ms. Johnson did not correct her erroneous concession. Accordingly, the district court dismissed with prejudice all of the common-law claims, including the minors' claims, and it subsequently dismissed the entire case on the ground that the plaintiffs had failed to plead adequate facts to withstand a motion to dismiss the federal civil rights and constitutional claims. Later, during an unsuccessful mediation, the defendants' lawyers told the Rudders that they had "no leverage" because they had "given up [their] rights."

Ms. Johnson did not inform her clients when the government filed its motion to dismiss or when the court granted the motion. She did not advise them about the statute-of-limitations issues, nor did she consult with them before conceding to

dismissal of all of the common-law claims. Without informing them of what had happened, she moved for reconsideration and for leave to file an amended complaint. The evidence shows that Rosena Rudder emailed Ms. Johnson asking if the defendant's motion to dismiss had been denied—over a month *after* the district court had granted the motion. Ms. Johnson replied, claiming that the defendants were "not interested in settlement while the issue of dismissal is pending"; Ms. Johnson did not say in this email that dismissal had in fact been granted a month earlier.

After Ms. Johnson filed the motion to reconsider, the Rudders discovered on their own that their case had been dismissed and confronted Ms. Johnson. Only then did she tell them about the dismissal and that she was taking steps to reverse it. Ms. Johnson, however, understated the seriousness of the dismissal. As she testified, "I assured them everything is still on track; don't worry . . . ." Ms. Johnson falsely represented that the "case was not dismissed due to [her] error"; rather, she told the Rudders, the court "just dismissed the case on its own initiate [sic] which was clearly an error and was inappropriate."

The district court denied the motion for reconsideration. Ms. Johnson then filed an appeal, again without consulting with or informing her clients. While the appeal was pending, Mr. Rudder sent a letter to Ms. Johnson to terminate the

attorney-client relationship. He also sent a letter to the D.C. Circuit seeking a continuance to obtain new counsel, asserting that Ms. Johnson had performed incompetently. In November 2010, Mr. Rudder filed a complaint with Disciplinary Counsel.

Ms. Johnson responded by warning the Rudders that if they continued to claim the case was dismissed due to her error, they "will *not be* successful on appeal." The Rudders kept Ms. Johnson as their attorney, and she filed an appellate brief on their behalf, again without sharing a draft or consulting with them.

During the appeal, the Rudders fired Ms. Johnson and proceeded with another attorney. In January 2012, the D.C. Circuit reversed the district court in part and reinstated the minors' common-law claims and the constitutional claims against the individual officers. The adults' common-law claims remained dismissed as time-barred. Ultimately, the parties settled the case.

To Disciplinary Counsel and before the Committee, Ms. Johnson made false or misleading statements and tried to minimize her responsibility for the dismissal or blame her clients. For example, she claimed in correspondence with Disciplinary Counsel that she had filed a "similar case for excessive force," based, she later

acknowledged, on her involvement in a police misconduct case as a paralegal. She falsely told Disciplinary Counsel that she had not missed any deadlines, notwithstanding the statute-of-limitations issues. She claimed that she had "previously informed the Rudders of the issue of the dismissal," but the evidence established that she did so only after the district court denied her motion to reconsider, seven months after the defendants had moved to dismiss. And she characterized the disciplinary complaint as a misunderstanding, asserting that "Mr. Rudder is not an attorney and does not realize . . ." or "does not understand" what happened.

### 2.      Count 2: Representation of Donnell Lewis in a Divorce Matter

In July 2007, Donnell Lewis signed a retainer agreement with Ms. Johnson for representation in a divorce matter that was pending in D.C. Superior Court. Ms. Johnson entered her appearance and the court scheduled a status hearing without consulting Ms. Johnson about her availability. Ms. Johnson had a conflict on the date set by the court but did not move for a continuance or find substitute counsel, although she did arrange to participate by telephone.

Approximately one month before the hearing, Ms. Johnson informed Mr. Lewis that she intended to withdraw as his attorney because he had not paid her. Because the matter was pending before a court, however, she was required to move for the court's consent to withdraw. She did not do so.

On the day of the status hearing, Ms. Johnson did not appear in person; and, although she had obtained approval to appear by telephone, the court clerk was unable to reach her because she was in another courtroom at the time. The court was unhappy that Ms. Johnson was not present because the case had "been continued numerous times" and expressed its "frustrat[ion] that [Ms. Johnson] has just chosen not to be here today." The court asked Mr. Lewis why his counsel was not present. In response, Mr. Lewis disclosed confidential information about his relationship with Ms. Johnson.

Ms. Johnson thereafter filed a motion to withdraw in which she revealed in greater detail confidential information about Mr. Lewis's situation. Ms. Johnson did not file the motion to withdraw *in camera* or *ex parte* because she was not aware that she could do so. Mr. Lewis had not given Ms. Johnson permission to disclose the basis of her motion to withdraw.

### 3. Count 3: Representation of Glenn Strawder in a Medical Malpractice Matter

In 2004, Glenn Strawder suffered a retinal tear in his left eye and lost all vision in that eye. Mr. Strawder believed the tear was the result of medical malpractice and sought legal representation. In April 2007, he found Ms. Johnson, who agreed to take his case on a contingent fee basis (with Mr. Strawder paying costs and expenses), even though she had no experience handling a complex medical malpractice case.

Ms. Johnson testified that she planned to file suit to preserve the cause of action before the statute of limitations expired and then hand the case off to a more experienced lawyer. She did not do so. Ms. Johnson drafted a complaint using a model form she had obtained at a seminar. The complaint sought damages for pain and suffering, medical expenses, and lost earnings.

Ms. Johnson had difficulty finding a qualified expert witness who would testify that the defendants had violated the applicable standard of care. Two experts opined that they could not support a claim of breach of the standard of care. Nonetheless, Ms. Johnson arranged for Mr. Strawder to take out loans against the value of his cases from a litigation financing company. Ms. Johnson told Mr.

Strawder that she believed in the strength of his case and encouraged him to apply for the litigation loans, which she submitted on his behalf. She did so notwithstanding the views of the experts she had contacted and her failure to try to value the case. Ms. Johnson told the litigation finance company that the case was valued at $5 million, but she testified at the hearing that she "didn't know whether [Mr. Strawder's] case had value" and she had "no idea" how that number was arrived at. She also told the finance company that Mr. Strawder understood the terms of the loan when, in fact, he did not. After exhausting his own funds, Mr. Strawder borrowed more than $17,000.

Ms. Johnson did not explain to Mr. Strawder "the implications of borrowing the funds, including the high interest rate" he would be charged if he received any recovery. Moreover, despite requests from Mr. Strawder, Ms. Johnson never provided him with accounts of how she used the loan funds or with records or receipts accounting for the funds Mr. Strawder paid her.

Ms. Johnson was ultimately able to secure a medical expert, but he was not a retinal specialist. Ms. Johnson failed to obtain and provide the expert with Mr. Strawder's complete medical records before he was deposed, a fact that came out at the deposition. During an unsuccessful mediation, Ms. Johnson persuaded Mr.

Strawder to dismiss the individual doctor from the case without getting anything in return, because she believed it made the case easier to settle. According to a medical malpractice expert, this was a "serious" mistake. Ms. Johnson told the Committee that Mr. Strawder made the decision to dismiss the doctor, but the Committee found this assertion intentionally false.

Ms. Johnson withdrew from the case in February 2009. The court later denied Mr. Strawder's new counsel's request to re-open discovery, and Mr. Strawder accepted what he believed was a nuisance-value settlement.

### 4. Count 4: Representation of Katina Wilson in Separate Child Custody and Personal Injury Matters

a. In July 2012, Katina Wilson retained Ms. Johnson to represent her on an hourly fee basis in seeking sole custody of her daughter. Ms. Wilson paid $1,000 as an advance fee, which Ms. Johnson deposited into her Interest on Lawyer Trust Accounts (IOLTA) account. Shortly thereafter, Ms. Johnson entered her appearance on Ms. Wilson's behalf in D.C. Superior Court. Trial was scheduled for July 2013.

Ms. Johnson represented Ms. Wilson through discovery and pre-trial matters. Ms. Wilson requested that Ms. Johnson's office provide her regular invoices. Ms.

Johnson sent invoices for the first few months, but then stopped, and she did not maintain detailed time records. Ms. Wilson continued to make monthly payments (sometimes twice a month), often in thousand-dollar amounts, despite not knowing what services she was paying for. She paid Ms. Johnson $16,000 in total.

Ms. Johnson failed to prepare Ms. Wilson's case for trial. She failed to prepare any fact witnesses whom Ms. Wilson had identified (including a witness about domestic abuse, which was an issue in the case), despite telling Ms. Wilson that she would. She also provided Ms. Wilson incomplete information about what was happening with her case. In addition, Ms. Johnson mishandled discovery issues, which led to various disputes and ultimately to the imposition of sanctions on Ms. Wilson at trial.

Ms. Johnson frequently failed to comply with discovery rules and scheduling orders. Opposing counsel unsuccessfully tried to get complete discovery responses from Ms. Johnson. She did not provide this information even though Ms. Wilson had provided her with the requested information. Eventually, Ms. Johnson provided some discovery responses after being compelled by court order, but some of the responses were evasive and nonresponsive.

About one week before the trial, Ms. Johnson told Ms. Wilson that she was going to withdraw as her attorney because she had received an opportunity to teach a course overseas that conflicted with the scheduled trial. Ms. Johnson described the course to opposing counsel as a "great career opportunity" for her. Ms. Johnson told Ms. Wilson that she had arranged for another attorney to stand in for her at trial. She misled Ms. Wilson about the potential ramifications of changing counsel and she falsely told Ms. Wilson that the stand-in attorney was "of counsel" in her law firm. Ms. Johnson also told Ms. Wilson that "[i]t will not take a rocket scientist to represent someone in a custody case."

Ms. Wilson was initially amenable to having the other attorney handle her case. She believed that the new counsel was prepared and would bill at the same hourly rate as Ms. Johnson. Ms. Johnson did not explain that the successor counsel was expecting fees up to $20,000, in addition to the $16,000 Ms. Wilson had already paid. After she found out about the new counsel's fees, Ms. Wilson decided that she could not afford to pay and that her only option was to proceed to trial pro se.

Ms. Johnson did not explain to Ms. Wilson that there were unresolved discovery disputes and pending sanction motions to be addressed at trial, let alone how to handle these issues. Ms. Wilson did not learn of the most recent sanction

motion until Ms. Johnson uploaded it to a shared file system, and she was unaware that she could be held personally liable for the discovery disputes that had arisen during Ms. Johnson's handling of the case.

Ms. Johnson left the country without having filed or been granted a motion to withdraw, without having informed the presiding judge, and without having arranged for successor counsel. She also did not turn over the case file to Ms. Wilson or prepare her for the trial, including how to examine and cross-examine witnesses. While Ms. Johnson had subpoenaed witnesses to testify for Ms. Wilson, she had not prepared them for trial. The same day Ms. Johnson left the country, Ms. Wilson emailed all the parties to tell them she would proceed pro se.

Two days before trial and three days after she had left the country, Ms. Johnson filed a motion to withdraw. The same day, opposing counsel filed a fourth motion to compel discovery and for sanctions based on Ms. Johnson's failure to submit complete responses. Ms. Johnson did not file an opposition, nor did she explain to Ms. Wilson why opposing counsel had filed the motion or how she should respond.

Ms. Wilson appeared alone for the trial. Pursuant to a court order, Ms. Johnson appeared by telephone to address why Ms. Wilson was appearing without counsel. The court then granted Ms. Johnson's withdrawal motion. Ms. Wilson represented herself, including presenting witnesses and addressing the outstanding discovery and sanctions motions. Ms. Wilson relied on her recollection of scenes from the television program "Law and Order" to raise objections. She also "Googled what to ask" to assist her in examining witnesses.

Ms. Wilson learned from opposing counsel that she was entitled to submit documentary exhibits and have access to a trial notebook. Thus, after the first two days of trial, Ms. Wilson went to Ms. Johnson's office to obtain exhibits and a trial notebook from Ms. Johnson's paralegal. The court permitted her to late-file the exhibits but did not permit her to submit anything "new."

Despite Ms. Johnson's conduct and eleventh-hour withdrawal, Ms. Wilson was able to prevail and obtain full custody of her daughter. Even though she prevailed, the court sanctioned Ms. Wilson $1,089 in attorney's fees and costs for discovery failures for which Ms. Johnson was responsible. Ms. Johnson did not reimburse Ms. Wilson for those sanctions or for any of the $16,000 Ms. Wilson had paid in fees. After Ms. Johnson stopped handling the case, Ms. Wilson requested a

final bill from her. Ms. Johnson never provided one. In response to Disciplinary Counsel's investigation, however, Ms. Johnson created two different versions of billing invoices, each of which she termed a "comprehensive bill" and "itemized accounting of all of the time that [she] spent in her representing Ms. Wilson."

b. In August 2012, several months after she retained Ms. Johnson in the child custody matter, Ms. Wilson was struck by a cab while walking in a crosswalk. Ms. Johnson agreed to handle the matter for Ms. Wilson on a contingency fee basis. Although Ms. Johnson drafted a fee agreement for a 33 percent contingency fee, Ms. Wilson never signed the agreement, and Ms. Johnson did not provide anything else in writing about the basis or rate of the fee.

Ms. Johnson's office sent Ms. Wilson to the Maryland Injury Center to receive treatment for her injuries. Ms. Johnson also sent a letter to the cab driver's insurance company demanding $30,000, and the insurer responded with an offer to settle. Ms. Johnson never shared this offer with Ms. Wilson. Ms. Johnson settled with the insurer for $4,500 without discussing the offer with Ms. Wilson and without her approval. Later, without being informed about the total amount offered in settlement or given the chance to approve the offer, Ms. Wilson was told that she would receive $1,500 as her portion of the settlement. Ms. Wilson asked that her share of the

settlement funds be applied to Ms. Johnson's bill for her legal fees in the child custody matter. Ms. Johnson, however, never accounted to Ms. Wilson how the settlement funds were used or applied to the bill for the child custody case.

Ms. Johnson deposited the $4,500 settlement check into her trust account. She later obtained a $2,960 reduction of the Maryland Injury Center's fee for medical services to $1,500 by falsely representing that her firm would reduce its 33 percent fee. In fact, Ms. Johnson took $1,500, which was her full one-third of the settlement amount. Six months after placing the settlement funds into her trust account, Ms. Johnson sent a $1,500 check to the Maryland Injury Center.

### 5. Financial Record-Keeping and Commingling

Due to the accounting irregularities in the Wilson matters, Disciplinary Counsel, with the assistance of a forensic investigator, sought to analyze Ms. Johnson's accounting more generally. Ms. Johnson failed over the course of almost a year to provide requested accounting and supporting documents. Eventually, with respect to the Wilson matters, Ms. Johnson submitted to Disciplinary Counsel two different invoices bearing the same number and date. The Hearing Committee did not conclude that either invoice was intentionally false, but it determined that Ms.

Johnson's record-keeping in the Wilson matters was unreliable and that neither invoice had been submitted to Ms. Wilson.

This prompted Disciplinary Counsel to focus its attention on one of Ms. Johnson's IOLTA accounts. As with the Wilson invoices, Ms. Johnson provided Disciplinary Counsel with two different versions of client account ledgers covering the same time period. The forensic investigator tried to compare the second, purportedly "updated" ledger against relevant bank records but found that it was impossible for him to match up the transactions. The investigator nonetheless concluded that Ms. Johnson's IOLTA account was short at least $3,000 from what should have been in the account according to the ledger.

In digging deeper, the forensic investigator determined that accounts for certain randomly selected clients were short when compared with bank records, including the account of Fuad and Marenikeji Aregbe, which was $350 short, and the account of Dionne Hart, which was $786 short. And, although checks for a settlement in Ms. Hart's matter were deposited in the IOLTA account, Ms. Johnson wrote a check from a different account to pay a health care center on behalf of Ms. Hart.

Ultimately, the Committee found that Ms. Johnson negligently (but not recklessly or intentionally) misappropriated Ms. Hart's entrusted funds, commingled funds by leaving earned fees in her IOLTA account, failed to keep reliable and complete records of client funds, failed to respond to Disciplinary Counsel's inquiries and subpoenas in a truthful and expeditious manner, and provided conflicting and contradictory versions of requested documents.

## B. The Disciplinary Process

In June 2018, the Office of Disciplinary Counsel instituted disciplinary proceedings against Ms. Johnson, alleging in a five-count Specification of Charges that she had committed multiple rule violations in connection with the client matters and record-keeping addressed above and also an additional non-client matter. The Committee held a four-day hearing in March 2019, at which Disciplinary Counsel presented the testimony of 11 witnesses, including three experts. Ms. Johnson testified but did not present any other witnesses.

In October 2019, the Committee issued its Report and Recommendation, finding clear and convincing evidence that Ms. Johnson violated Rules of Professional Conduct 1.1(a) and (b), 1.2(a), 1.3(a), 1.3(b)(1) and (2), 1.3(c), 1.4(a)

and (b), 1.4(c), 1.5(a)-(c), 1.6(a)(1), 1.15(a), 1.15(c), 1.16(d), 3.4(c), 8.4(c), and 8.4(d). The Committee found that several of the Rule violations occurred more than once, as they were repeated among multiple counts, and also that Ms. Johnson intentionally testified falsely at the hearing. The Committee recommended the sanction of disbarment after considering (1) the seriousness of Ms. Johnson's conduct; (2) prejudice to the clients; (3) whether the conduct involved dishonesty; (4) violation of other disciplinary rules; (5) Ms. Johnson's disciplinary history; (6) whether Ms. Johnson had acknowledged her wrongful conduct; and (7) mitigating circumstances. *See In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013).

Ms. Johnson filed exceptions to the Committee's Report and Recommendation. In an October 2020 Report and Recommendation, the Board found that four alleged Rule violations (Rule 1.5(b), Rule 3.4(c), and two violations of Rule 8.4(d)) had not been proven by clear and convincing evidence but otherwise upheld the Committee's Report and Recommendation, resulting in a determination that Ms. Johnson had committed over 20 rule violations and testified falsely in several respects at the hearing.[2] The Board adopted the Committee's

---

[2] The Board concluded that Ms. Johnson violated the following Rules:
- Rule 1.1(a) and (b) (competence) (three counts);

recommendation of disbarment. In so doing, it cited the seven-year span of Ms. Johnson's misconduct, Ms. Johnson's false testimony at the Committee hearing, and her lack of remorse, and it explained that Ms. Johnson's "repeated, persistent, and pervasive dishonesty constituted flagrant dishonesty such that . . . [she] should be barred from the continued practice of law."

---

- Rule 1.2(a) (consulting with client and abiding by client's decisions) (one count);

- Rule 1.3(a) (diligence and zeal) (two counts);

- Rule 1.3(b)(1) and (2) (seek client's lawful objectives and not prejudice or damage client) (three counts);

- Rule 1.3(c) (reasonable promptness) (three counts);

- Rule 1.4(a) and (b) (communication) (three counts);

- Rule 1.4(c) (informing client of settlement offer) (one count);

- Rule 1.5(a) and (c) (reasonableness of fee and communication of contingent fee arrangement) (one count);

- Rule 1.6(a)(1) (client confidentiality) (one count);

- Rule 1.15(a) (safekeeping of records) (one count);

- Rule 1.15(a) (negligent misappropriation, commingling, and record-keeping) (one count);

- Rule 1.15(c) (accounting of client funds) (one count);

- Rule 1.16(d) (terminating representation) (one count);

- Rule 8.4(c) (dishonesty, fraud, deceit, or misrepresentation) (three counts);

- Rule 8.4(d) (serious interference with administration of justice) (one count).

Ms. Johnson filed a brief in this court, taking exception to most of the Board's findings of fact and conclusions of law and its recommended sanction. The Office of Disciplinary Counsel did not file exceptions, but it filed a brief supporting the Board's Report and Recommendation.

## II. Discussion

We "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and [we] adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1). "Substantial evidence means enough evidence for a reasonable mind to find sufficient to support the conclusion reached." *In re Evans*, 902 A.2d 56, 70 (D.C. 2006) (per curiam) (internal quotation marks omitted). We review the Board's legal determinations de novo. *In re Samad*, 51 A.3d 486, 495 (D.C. 2012) (per curiam).

Before this court, Ms. Johnson argues that (1) the consideration of expert testimony by the Committee deprived her of her right to a fair hearing; (2) the Committee's and Board's factual findings are unsupported by substantial evidence;

(3) the Board's legal conclusions regarding her Rule violations are erroneous; and

(4) disbarment is unwarranted.  We take each claim in turn.

### A.     Consideration of Expert Testimony

At a pre-hearing conference seven months before the hearing, Disciplinary Counsel disclosed to Ms. Johnson that it might call expert witnesses.  In accordance with the Committee's pre-trial order, Disciplinary Counsel disclosed its expert witnesses' identities, subject areas, and contact information before the hearing.  The three identified witnesses had expertise in the standards of care for police misconduct cases, personal injury law, and domestic relations cases.

One week before the hearing, Ms. Johnson moved to exclude the experts' testimony on the ground that Disciplinary Counsel failed to provide sufficient information on the witnesses' areas of expertise, the subject matter of the testimony, or the substance of the experts' opinions.  The Committee denied the motion, qualified the witnesses as experts, and heard their testimony on direct and cross-examination.

The Board rejected Ms. Johnson's claim that the Committee erred in considering the testimony. The Board stated that pre-hearing discovery of expert reports or expert opinion testimony is not required by the Board Rules and that Ms. Johnson was able to cross-examine the witnesses concerning their qualifications and expertise.

In this court, Ms. Johnson renews her claim about insufficient disclosures and also argues that the experts improperly testified about an ultimate issue, namely, the existence of rule violations. We discern no error. Whether evidence—including expert testimony—is relevant and admissible under Board Rule 11.3 is "within the ambit of the Hearing Committee's discretion," *In re Speights*, 173 A.3d 96, 102 (D.C. 2017) (per curiam), and is not governed by "the rules of evidence applicable in other proceedings," *id*. Expert testimony regarding standards of care is not uncommon in disciplinary hearings. *See, e.g.*, *id*. at 100-02; *In re Outlaw*, 917 A.2d 684, 686 (D.C. 2007) (per curiam); *In re Fair*, 780 A.2d 1106, 1111-12 (D.C. 2001). The record reflects that the experts here provided opinion testimony about the applicable standards of care, not conclusions about Ms. Johnson's violations of Rules of Professional Conduct.

In addition, as Ms. Johnson concedes, the Board Rules impose no requirements regarding expert disclosures, and, in any event, Disciplinary Counsel disclosed its expert witnesses' identities, subject areas, and contact information before the hearing. Ms. Johnson suffered no prejudice, as she was permitted to question the experts regarding their qualifications and expertise on cross-examination.

### B.     The Committee's and Board's Factual Findings

Ms. Johnson lodges 82 exceptions to the Committee's and Board's factual findings. The Committee heard testimony by all of the adult clients involved in the matters at issue and three expert witnesses and considered over 100 exhibits. We have carefully reviewed the record and Ms. Johnson's exceptions, and we conclude that the findings are supported by substantial—if not overwhelming—evidence of record, including testimony that the Committee found credible or, in the case of Ms. Johnson, not credible. We are required to "place great weight on credibility determinations made by the Board and the Hearing Committee because of the Hearing Committee's unique opportunity to observe the witnesses and assess their demeanor." *In re Klayman*, 282 A.3d 584, 593 (D.C. 2022) (per curiam) (internal quotation marks omitted); *see In re Godette*, 919 A.2d 1157, 1164 (D.C. 2007) ("An

appellate body's duty to defer to the findings of the trier of fact is obviously at its zenith where that trier of fact had the opportunity to hear the testimony and observe the demeanor of the witness.").

Ms. Johnson's exceptions are largely conclusory or circular,[3] or they focus on the weight given to evidence[4] or on inconsequential alleged discrepancies.[5] But "the weight, value and effect of the evidence" "fall primarily within the sphere customarily left to the factfinder," *In re Temple*, 629 A.2d 1203, 1208 (D.C. 1993),

---

[3] For example, Ms. Johnson states, without explaining why the evidence was insufficient, that she "excepts to the finding of fact . . . that she did not discuss with her clients the motions to reconsider after the dismissal of the complaint"; that "the Hearing Committee's finding that Mr. Lewis found it stressful to appear at the status hearing is contradicted by the fact that Mr. Lewis represented himself in the case and appeared in Court without counsel for two years"; and that successor counsel for Ms. Wilson "was provided with adequate information and documents relating to the case" and "two hours spending going over the facts of the case and documents was sufficient for her to prepare for the case."

[4] For example, Ms. Johnson claims that the Hearing Committee did not read certain evidence "in context"; that the finding that the Rudders hired her due to her purported experience in police brutality cases is "unfounded" because she herself did not testify at the hearing that she made such a representation to the Rudders; and that "the Hearing Committee appears to be naive to the fact that [a] discovery dispute as to the adequacy of a response is distinct from failing to respond to discovery."

[5] For example, Ms. Johnson asserts that the adults in the Rudder matter did not accept "judgment[s]" that included diversion, as found by the Hearing Committee, but rather "entered into" a diversion program to resolve their criminal charges; and that the Hearing Committee's finding that Ms. Johnson's intern attempted to contact witnesses in the Rudder matter "later" did not establish that the attempt did not occur in 2008 (the year of the incident).

and "[t]his court must accept a finding that is supported by substantial evidence in the record as a whole, even though there may also be substantial evidence in the record to support a contrary finding," *Godette*, 919 A.2d at 1163 (internal quotation marks omitted). Accordingly, we will not disturb the Hearing Committee's and Board's factual findings.

### C. The Board's Conclusions of Law

Many of Ms. Johnson's challenges to the findings of specific rule violations rest on her version of the facts. As we have explained, however, we must accept the factual findings of the Committee and the Board if those findings are "supported by substantial evidence in the record as a whole." *Godette*, 919 A.2d at 1163. That is true even if "there might also be substantial evidence to support a contrary finding." *Id*. (internal quotation marks omitted). Having reviewed the record, we conclude that substantial evidence supports the Board's conclusion that Ms. Johnson violated the rules at issue.

> Because the reports and recommendations below are voluminous and meticulously detailed, we will not cite to every factual example, exhibit, excerpt of the transcript, and so forth. Rather, we conclude that substantial evidence of each charged violation is supported by a

handful of notable examples upon which we will focus our review.

*In re (Johnnie) Johnson*, 275 A.3d 268, 276 (D.C. 2022) (per curiam).

### 1.  Rule 1.1(a) and (b) (competence) (Rudders, Lewis, and Strawder)

Rule 1.1(a) requires lawyers to provide competent representation, defined as "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."  Rule 1.1(b) requires lawyers to serve their clients with "skill and care commensurate with that generally afforded to clients by other lawyers in similar matters."  Competent representation requires the "legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."  *In re Drew*, 693 A.2d 1127, 1130, 1132 (D.C. 1997) (per curiam).  Rule 1.1(b) is "better tailored [than Rule 1.1(a)] to address the situation in which a lawyer capable to handle a representation walks away from it for reasons unrelated to his competence in that area of practice."  *In re Lewis*, 689 A.2d 561, 564 (D.C. 1997) (per curiam).  "[T]the same failings that constitute . . . 1.1(a) violations [can] constitute 1.1(b) violations."  *Evans*, 902 A.2d at 72.

We find ample evidence of record to support the conclusion that Ms. Johnson violated Rules 1.1(a) and (b) in the Rudder, Lewis, and Strawder matters. Among other things, Ms. Johnson failed to adequately investigate the Rudder case, was unaware of basic principles in police misconduct cases, and allowed the statute of limitations to run on the adult Rudders' common-law claims and then explicitly—and "inexplicably," *Rudder v. Williams*, 666 F.3d 790, 793 (D.C. Cir. 2012)—conceded that the children's claims should be dismissed too. What's more, she failed to correct her error after being made aware of it. *See In re Ekekwe-Kauffman*, 210 A.3d 775, 787 (D.C. 2019) (per curiam) (attorney "failed to correct her errors after being made aware of them"). In the Lewis matter, Ms. Johnson arranged to participate in the hearing by telephone but then could not be reached, and she failed to file her motion to withdraw, which revealed client confidences, *in camera* or *ex parte* because she did not know she could. And with respect to Mr. Strawder, Ms. Johnson did not know how to value a medical malpractice claim and had no idea where the $5 million valuation for Mr. Strawder's case came from, allowed the expert witness to be deposed without sufficient preparation, and dismissed the individual doctor from the case without obtaining anything in return. In all three matters, Ms. Johnson demonstrated a "'fail[ure] to engage in the thoroughness and preparation reasonably necessary' for the case[ ] that clearly prejudiced her client." *Id*. (quoting *Evans*, 902 A.2d at 69-70).

We therefore accept the Board's conclusion that Ms. Johnson violated Rules 1.1(a) and 1.1(b) multiple times.

### 2. Rule 1.2(a) (consulting with client and abiding by client's decisions) (Wilson)

Rule 1.2(a) obligates a lawyer to "abide by a client's decisions concerning the objectives of the representation . . . and [to] consult with the client as to the means by which they are to be pursued." The Board credited Ms. Wilson's testimony that Ms. Johnson did not present her with the insurer's offer to settle her personal injury claim. We have no basis to disturb that factual finding, and it supports a conclusion that Ms. Johnson violated Rule 1.2(a). *See In re Elgin*, 918 A.2d 362, 375 (D.C. 2007); *In re Hager*, 812 A.2d 904, 919 (D.C. 2002).

### 3. Rule 1.3(a) (diligence and zeal) (Rudders and Strawder)

Rule 1.3(a) states that an attorney "shall represent a client zealously and diligently within the bounds of the law." The same facts supporting the Rule 1.1(a) and (b) violations support Rule 1.3(a) violations in the Rudder and Strawder representations. *See In re Cater*, 887 A.2d 1, 16 & n.14 (D.C. 2005) (same evidence

can support multiple charges of rule violations). Ms. Johnson's "conduct not only fell short of her obligation to provide zealous and diligent representation—it also demonstrated a pattern of neglect, which we have defined as 'indifference and a consistent failure to carry out the obligations that the lawyer has assumed to the client.'" *Ekekwe-Kauffman*, 210 A.3d at 778 (quoting *In re Wright*, , 1255 (D.C. 1997) (per curiam)).

4.  **Rule 1.3(b)(1) and (2) (seek client's lawful objectives and not prejudice or damage client) (Rudders, Strawder, and Wilson)**

Rule 1.3(b) provides that "[a] lawyer shall not intentionally: (1) [f]ail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules; or (2) [p]rejudice or damage a client during the course of the professional relationship." "Rule 1.3(b) does not 'require proof of intent in the usual sense of the word.'" *In re Dickens*, 174 A.3d 283, 300 (D.C. 2017) (quoting *In re Ukwu*, 926 A.2d 1106, 1116 (D.C. 2007)). "Rather, neglect ripens into an intentional violation when the lawyer is aware of her neglect of the client matter; or put differently, when a lawyer's inaction coexists with an awareness of her obligations to her client." *Id*. (cleaned up). Intent can also be found where "the neglect is so pervasive that the lawyer must be aware of it." *Lewis*, 689 A.2d at 564.

Again, the evidence relating *to* the Rudder, Strawder, and Wilson matters—including Ms. Johnson's failure to correct her erroneous concession about dismissal of the Rudder children's claims, her dismissal of the individual doctor in Mr. Strawder's case, and her abandonment of Ms. Wilson on the eve of trial—establishes pervasive neglect that prejudiced clients. *See Ekekwe-Kauffman*, 210 A.3d at 788 (attorney's "failure to correct those deficiencies in the amended complaint ripened into an intentional violation because she was undoubtedly aware of the problems by that point") (cleaned up); *In re Vohra*, 68 A.3d 766, 781 (D.C. 2013) (finding violations of Rules 1.3(b)(1) and (2) where attorney was made aware of the need to cure deficiencies in client's visa applications and failed to do so, seriously prejudicing client's pursuit of permanent resident status); *Ukwu*, 926 A.2d at 1116 ("Knowing abandonment of a client is the classic case of a Rule 1.3(b)(1) violation.") (cleaned up).

5. **Rule 1.3(c) (reasonable promptness) (Rudders, Strawder, and Wilson)**

Rule 1.3(c) provides that an attorney "shall act with reasonable promptness in representing a client." Ms. Johnson clearly failed to act with reasonable promptness in investigating, filing a complaint, and correcting her error in the Rudder case. In

the Strawder matter, she failed to order medical records to prepare the expert before his deposition. Regarding Ms. Wilson, she repeatedly failed to comply with discovery requests and orders and to prepare witnesses for trial, and, of course, she withdrew at the eleventh hour without acting earlier to ensure that Ms. Wilson was not left to proceed on her own. We have little difficulty finding multiple Rule 1.3(c) violations.

**6. Rule 1.4(a) and (b) (communication) (Rudders, Strawder, and Wilson)**

Rule 1.4(a) provides that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." Similarly, Rule 1.4(b) states than an attorney "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The Rule places the burden on the attorney to "initiate and maintain the consultative and decision-making process if the client does not do so and [to] ensure that the ongoing process is thorough and complete." D.C. R. Prof. Conduct 1.4, cmt. [2].

"While [a]n attorney need not communicate with a client as often as the client would like, the attorney's communication with the client must be reasonable under

the circumstances." *Ekekwe-Kauffman*, 210 A.3d at 789 (internal quotation marks omitted). "Accordingly, the 'guiding principle' for evaluating conduct under Rule 1.4 is whether the lawyer fulfilled 'reasonable client expectations for information' consistent with the lawyer's 'duty to act in the client's best interests' and the client's overall objectives." *Id*. (quoting D.C. R. Prof. Conduct 1.4, Cmt. [3]). "To meet that expectation, a lawyer not only must respond to client inquiries but also must initiate communications to provide information when needed." *Id*. (internal quotation marks omitted). "[A] lawyer may not withhold information to serve the lawyer's own interest or convenience." *In re Mitrano*, 952 A.2d 901, 927 (D.C. 2008) (quoting D.C. R. Prof. Conduct 1.4, Cmt. [5]).

The record is replete with examples of Ms. Johnson failing to keep her clients informed, and, in some cases, withholding information to serve her own interests, such as her interest in avoiding discovery of her statute-of-limitations error. *See, e.g.*, *Klayman*, 282 A.3d at 596 (upholding finding of Rule 1.4(b) violation where attorney "did not consult with [client] before taking important steps in the litigation"); *Ekekwe-Kauffman*, 210 A.3d at 789 (violations of Rules 1.4(a) and (b) where attorney "repeatedly failed to inform [client] of the developments in her case in a timely manner" and client "testified that she had to inquire several times over a period of two or three weeks before [attorney] told her that the trial court had

dismissed her original complaint"); *In re Starnes*, 829 A.2d 488, 506 (D.C. 2003) (per curiam) (finding Rule 1.4(a) violation where lawyer "routinely failed to keep his clients informed of developments in their respective cases"). We recognize that Ms. Johnson disputes these factual findings and testified to the contrary regarding a number of these occurrences. But we cannot agree that the Committee's findings were not supported by substantial record evidence. The Committee chose to credit the testimony of the clients over that of Ms. Johnson, as it was entitled to do in its role as factfinder. *See Ekekwe-Kauffman*, 210 A.3d at 790; *Klayman*, 282 A.3d at 593; *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013) (per curiam); *Godette*, 919 A.2d at 1164. We generally will not second guess such a credibility determination, *Klayman*, 282 A.3d at 593, and we particularly decline to do so where, as in at least one instance here, there is documentary evidence—the emails between Rosena Rudder and Ms. Johnson indicating that the Rudders did not know that dismissal had been granted over a month earlier—corroborating the credited witness's account. *See Ekekwe-Kauffman*, 210 A.3d at 790.

### 7. Rule 1.4(c) (informing client of settlement offer) (Wilson)

Rule 1.4(c) provides that "[a] lawyer who receives an offer of settlement in a civil case . . . shall inform the client promptly of the substance of the communication." Ms. Johnson's failure to inform Ms. Wilson of the insurer's

settlement offer violates this rule as well.  *See Elgin*, 918 A.2d at 375; *In re Thyden*, 877 A.2d 129, 143-44 (D.C. 2005).

**8.      Rule 1.5(a) and (c) (reasonableness of fee and communication of contingent fee arrangement) (Wilson)**

Rule 1.5(a) provides that "[a] lawyer's fee shall be reasonable."  We agree with the Board that, while Ms. Johnson's hourly fee in the Wilson custody case might not have been unreasonable, the fees Ms. Wilson ultimately paid were unreasonable in light of the substantial evidence that Ms. Johnson did not prepare witnesses, left Ms. Wilson to proceed pro se, and did not refund the amount of the discovery sanction imposed on Ms. Wilson based on Ms. Johnson's failures.

Rule 1.5(c) states in part that "[a] contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined . . . ."  Before the Board, Ms. Johnson conceded a violation of Rule 1.5(c) for not putting in writing the Wilson personal injury case contingency fee agreement.

### 9.     Rule 1.6(a)(1) (client confidentiality) (Lewis)

Rule 1.6(a)(1) provides that a lawyer shall not knowingly reveal a client's confidence or secret.  Rule 1.6(b) defines a "confidence" as "information protected by the attorney-client privilege under applicable law" and a "secret" as "other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client."  The evidence shows that Ms. Johnson publicly filed a motion to withdraw in which she revealed circumstances about Mr. Lewis that led her to inform him that she could no longer represent him.  We agree with the Board that the information Ms. Johnson revealed was "secret" and that Mr. Lewis's statements to the court—after he had been forced to appear alone and explain why his attorney was absent—neither constituted revelation of the same information nor served to impliedly authorize Ms. Johnson's disclosures under Rule 1.6(e)(4).

### 10.     Rule 1.15(a) (safekeeping of records) (Strawder)

As relevant here, Rule 1.15(a) provides that a lawyer shall keep complete records of client funds.  The evidence shows that, despite requests from Mr. Strawder, Ms. Johnson never provided him with accounts of how she used the loan

funds or with records or receipts accounting for the funds Mr. Strawder paid her.

We agree that this constitutes a violation of Rule 1.15(a).

**11. Rules 1.15(a) (negligent misappropriation, commingling, and record-keeping) and 1.15(c) (accounting of client funds) (Wilson)**

Rule 1.15(a) provides, as relevant here, that "[a] lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property." Rule 1.15(c) adds that "a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

Before the Board, Ms. Johnson conceded violations of these rules with respect to Ms. Wilson, based on her commingling of personal and client funds and her failure to make a prompt payment to the Maryland Injury Center. We also agree with the Board that substantial evidence establishes that Ms. Johnson committed negligent misappropriation and commingling with respect to Ms. Hart. *See Ekekwe-Kauffman*, 210 A.3d at 792 ("Misappropriation is defined as any unauthorized use of client's funds entrusted to a lawyer, including not only stealing but also unauthorized

temporary use for the lawyer's own purpose, whether or not she derives any personal gain or benefit therefrom.") (internal quotation marks omitted); *id*. ("To guard against the loss of clients' money, Rule 1.15(a) also requires a lawyer to hold client funds in a separate trust account and to avoid commingling her clients' funds with her own property.").

**12.  Rule 1.16(d) (terminating representation) (Wilson)**

Rule 1.16(d) states that, in connection with the termination of representation, "a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee or expense that has not been earned or incurred."  We have little difficulty concluding that Ms. Johnson violated this rule when she decided, a week before trial, to travel abroad to teach, failed to give reasonable notice to Ms. Wilson, failed to ensure that Ms. Wilson had new counsel she could afford, and failed to provide Ms. Wilson with the trial notebook and adequate instruction prior to trial.

### 13. Rule 8.4(c) (dishonesty, fraud, deceit, or misrepresentation) (Rudders, Strawder, and Wilson)

Rule 8.4(c) prohibits an attorney from engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation." "Rule 8.4(c) is not to be accorded a hyper-technical or unduly restrictive construction," *Ukwu*, 926 A.2d at 1113, and it "encompasses conduct evincing a lack of honesty, probity, or integrity in principle[;] a lack of fairness and straightforwardness[;] failure to provide information where there is duty to do so[; or] reckless disregard of the truth," *id*.

We agree with the Board that at least the following acts by Ms. Johnson constitute dishonesty under the standards described above: (1) her claim to the Rudders that she had handled previous police misconduct cases; (2) her assertion to the Rudders that their case was "still on track"; (3) her claim that the dismissal of the Rudders' complaint was "not due to [her] error"; (4) her representation to the litigation financing company in the Strawder matter that she had explained the terms of the financing arrangement to Mr. Strawder and that he understood those terms; and (5) her statement to the Maryland Injury Center that she would take a five percent reduction in her fees in order to convince the center to reduce its bill for services rendered to Ms. Wilson.

We also concur that Ms. Johnson was dishonest before Disciplinary Counsel and the Committee. For example, in response to an inquiry from the Office of Disciplinary Counsel regarding the Rudder case, Ms. Johnson described filing a "similar case for excessive force," when in fact she had never "filed" such a case as an attorney; even if Ms. Johnson had worked on a similar case as a paralegal, the clear implication of her claim was that she had experience as an attorney in police misconduct cases. *See Ukwu*, 926 A.2d at 1113 ("lack of fairness and straightforwardness" constitutes dishonesty) (internal quotation marks omitted). Ms. Johnson also told Disciplinary Counsel that she immediately advised the Rudders of the dismissal of their complaint, when the evidence shows (and she later admitted) that she did not do so until after the district court denied her motion for reconsideration.

### 14. Rule 8.4(d) (serious interference with administration of justice) (Wilson)

Rule 8.4(d) prohibits an attorney from engaging in "conduct that seriously interferes with the administration of justice." "To establish a violation of Rule 8.4(d), [Disciplinary] Counsel must prove by clear and convincing evidence that (1) the attorney either took improper action or failed to take action when he or she should have acted; (2) the conduct involved bears directly on a case in the judicial

process with respect to an identifiable case or tribunal; and (3) the conduct taints the judicial process in more than a *de minimis* way, meaning that it must at least potentially impact upon the process to a serious and adverse degree." *(Johnnie) Johnson*, 275 A.3d at 279 (internal quotation marks omitted) (cleaned up). We agree with the Board that Ms. Johnson violated this rule in the Wilson child custody case by withdrawing just before trial, forcing the court to choose between delaying a child custody matter and allowing a party to handle a trial without counsel.

### D. Sanction

The Board agreed with the Hearing Committee's recommendation that Ms. Johnson be disbarred. The Board's recommended sanction comes to us with a "strong presumption in favor of its imposition," *In re Hallmark*, 831 A.2d 366, 371 (D.C. 2003), and "[i]f the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed," *In re McClure*, 144 A.3d 570, 572 (D.C. 2016) (per curiam) (internal quotation marks omitted). The ultimate responsibility of imposing sanctions, however, "rests with this court in the first instance." *Godette*, 919 A.2d at 1164 (internal quotation marks omitted). In imposing the sanction, we must ensure that we do not "foster a tendency toward inconsistent dispositions for comparable conduct" and that the sanction is not

"otherwise . . . unwarranted." D.C. Bar R. XI, § 9(h)(1). "Where this court takes a significantly different view of the seriousness of an attorney's conduct, the court thus has not hesitated to reach its own conclusion as to the appropriate sanction." *In re Baber*, 106 A.3d 1072, 1076 (D.C. 2015) (per curiam).

In imposing professional discipline, we aim "not only to maintain the integrity of the profession and to protect the public and the courts, but also to deter other attorneys from engaging in similar misconduct." *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013). "[T]he purpose of imposing a sanction is not to punish the attorney . . . ." *In re Avery*, 189 A.3d 715, 720 (D.C. 2018) (per curiam) (internal quotation marks omitted). When determining the appropriate disciplinary sanction, we evaluate "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances" as non-exhaustive factors. *Martin*, 67 A.3d at 1053.

Disbarment is "our harshest sanction." *In re Tun*, 286 A.3d 538, 547 (D.C. 2022). It is, however, an appropriate sanction for "flagrant dishonesty." *In re White*, 11 A.3d 1226, 1233 (D.C. 2011) (per curiam) ("Where this court has concluded that

the attorney's conduct falls into a category of dishonesty of a flagrant kind it has held disbarment to be the appropriate sanction."); *see also In re Mazingo-Mayronne*, 276 A.3d 19, 21 (D.C. 2022) (per curiam) ("a continuing and pervasive indifference to the obligations of honesty in the judicial system can warrant disbarment") (internal quotation marks omitted).

Flagrant dishonesty is either dishonesty accompanied by aggravating factors or continued and pervasive dishonesty. *See In re O'Neill*, 276 A.3d 492, 503 (D.C. 2022) ("demonstrated and persistent indifference to the truth" over six years justified disbarment); *Mazingo-Mayronne*, 276 A.3d at 22 ("disbarment can be warranted for a prolonged pattern of repeated dishonesty, even in the absence of the aggravating circumstances" such as criminal conduct or the improper taking of funds for personal gain); *In re Howes*, 52 A.3d 1, 15 (D.C. 2012) ("[W]here such dishonesty is aggravated and prolonged, disbarment is the appropriate sanction.").

We conclude that disbarment is warranted here based on Ms. Johnson's repeated and pervasive dishonesty over seven years, both in the representation of clients and before Disciplinary Counsel and the Committee. *See Baber*, 106 A.3d at 1077 ("The repeated and protracted nature of Mr. Baber's dishonesty weighs significantly in favor of disbarment."). In the Rudder matter, Ms. Johnson

misrepresented to the Rudders her experience handling police brutality cases, to their detriment; falsely represented that everything was "still on track" with their case; and falsely denied fault for the dismissal of claims in the case, seemingly to avoid revelation of her statute-of-limitations errors. During the investigation or before the Committee, she again claimed that she had filed a police brutality case and asserted, contrary to the clear record, that she had not missed any deadlines in the case and had kept her clients informed. In the Strawder matter, Ms. Johnson dishonestly made up a valuation of the lawsuit for the litigation financer when she did not even know how to value a medical malpractice claim and misrepresented to the lender that she had explained the terms of the financing arrangement to Mr. Strawder and that he understood those terms. And in the Wilson personal injury matter, Ms. Johnson falsely stated to Ms. Wilson's health care provider that she would take a five percent reduction in her fees in order to convince the health care provider to reduce its bill for services rendered to Ms. Wilson, when in fact Ms. Johnson did not reduce her fees to Ms. Wilson.

Moreover, Ms. Johnson's repeated dishonesty was accompanied by an appalling level of indifference to her clients, consistent incompetence that prejudiced her clients, a revelation of client confidences, financial mismanagement, and a lack of remorse and acknowledgement of responsibility. *See (Johnnie) Johnson*, 275

A.3d at 282 (disbarment warranted, even in the absence of prior disciplinary record, where behavior involved dishonesty, case handling prejudiced client's claim, attorney committed numerous rule violations, and attorney showed no remorse); *In re Moawad*, 268 A.3d 820, 821-22 (D.C. 2022) (per curiam) ("we look to the totality of the misconduct in determining whether the dishonesty was flagrant and have considered whether the intentional dishonesty was an attempt to hide other misconduct and blame others for his misconduct"); *id*. ("[w]e have also considered whether during the disciplinary proceedings respondent acknowledged his misconduct, showed remorse, or showed any willingness to pay restitution or return his client's unearned fees"); *Baber*, 106 A.3d at 1077-78 (disbarment warranted, even in the absence of prior disciplinary record, where dishonesty came at the expense of clients' interests, was compounded by conduct that betrayed client confidences, and prejudiced clients and attorney showed no remorse).

To be sure, taken in isolation, some of Ms. Johnson's false statements can be characterized as puffery, deflection, or an extension of her lack of competence. Considered together, though, we agree with the Committee and the Board that Ms. Johnson has exhibited a consistent lack of forthrightness, a willingness to shade the truth for her own benefit, and a disregard for the obligation for honesty and candor that comes with the privilege of membership in our jurisdiction's Bar. *See Baber*,

106 A.3d at 1077 ("honesty is basic to the practice of law, and . . . lawyers have a greater duty than ordinary citizens to be scrupulously honest at all times") (internal quotation marks omitted); *In re Williams*, 513 A.2d 793, 796 (D.C. 1986) (per curiam) ("We grant the license to practice law as a privilege, not as a right, and we do so only on the strict condition that the attorney aspire to the highest standards of ethical conduct.").

Finally, while recognizing that "[p]erfect consistency is not achievable in this area," *In re Silva*, 29 A.3d 924, 927 (D.C. 2011), because the "imposition of sanctions in bar discipline . . . is not an exact science but may depend on the facts and circumstances of each particular proceeding," *In re Goffe*, 641 A.2d 458, 463 (D.C. 1994) (per curiam), we are satisfied that disbarment here is consistent with the sanction imposed in comparable cases. *See, e.g.*, *(Johnnie) Johnson*, 275 A.3d at 282; *In re Bynum*, 197 A.3d 1072, 1074 (D.C. 2018) (per curiam) (disbarment warranted where attorney's "dishonest conduct spanned five years, from the outset of his representation of his clients, through the disciplinary hearing in this case, and [the] dishonesty [was] exacerbated by his lack of remorse and effort to shift the blame to others"); *Baber*, 106 A.3d at 1077-78; *id*. at 1078-79 (citing cases).

Accordingly, "[c]onsidering the circumstances of this case as a whole," *Baber*, 106 A.3d at 1078, we conclude that disbarment falls within the range of acceptable outcomes, is consistent with dispositions for comparable conduct, and is not otherwise unwarranted.

## III. Conclusion

Because the Committee's and Board's factual findings are supported by substantial evidence, we are required to adopt them. Reviewing the Board's legal conclusions *de novo*, we conclude that they are consistent with our precedent. Because disbarment for flagrant dishonesty is consistent with our prior decisions, and because it is warranted in Ms. Johnson's case in light of the number and seriousness of her rule violations, we adopt the Board's recommendation. Accordingly, it is ordered that Ms. Johnson is disbarred from the practice of law in the District of Columbia. For purposes of reinstatement, the effective date of Ms. Johnson's disbarment will not begin to run until she files an affidavit that complies with D.C. Bar Rule XI, § 14(g).

*So ordered.*